EUGENIA ROCHE, Plaintiff-Appellee, v. FIRESIDE CHRYSLER-PLYMOUTH, MAZDA, INC., *et al.*, Defendants-Appellants.

Second District No. 2—91—0141

Opinion filed September 24, 1992.

Robert E. Gordon and Lisa Thaviu, both of Gordon & Gordon, Ltd., of Chicago, for appellants.

Maureen Flaherty and Norman H. Lehrer, both of Lehrer, Flaherty & Canavan, P.C., of Wheaton, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, Eugenia Roche, filed a complaint in the circuit court of Du Page County against defendants, Fireside Chrysler-Plymouth, Mazda, Inc. (Fireside), Allen Gaines, Rick Weissberg, Roy Jacobsen and Jack Carroll. Plaintiff sought actual and punitive damages based on defendants' conversion of plaintiff's property. Additionally, plaintiff sought actual and punitive damages as well as reasonable attorney fees and costs based on defendants' violations of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act). (Ill. Rev. Stat. 1989, ch. 121½, par. 261 *et seq.*) A jury rendered a verdict in favor of plaintiff and against defendant Fireside on the conversion count, awarding plaintiff $1,155 in compensatory damages and $1,250 in punitive damages. The court heard arguments on the statutory

fraud count, finding Fireside had willfully violated sections 2 and 2C of the Consumer Fraud Act. (Ill. Rev. Stat. 1989, ch. 121½, pars. 262, 262C.) The court awarded plaintiff $750 in damages, $2,175.30 in costs, and $31,368.75 in attorney fees. Additionally, the court awarded plaintiff $350.93 in interest on the amount awarded by the jury.

Fireside appeals, contending: (1) that the trial court erred in finding that Fireside violated the Consumer Fraud Act, and (2) that the trial court abused its discretion in awarding plaintiff attorney fees under the Act.

The record in the instant case is large, comprising over 2,000 pages. A recitation of all of the testimony presented would serve only to unduly lengthen this opinion. Therefore, testimony will be recounted only insofar as it is necessary to our disposition of the instant issues.

On Friday, July 12, 1985, plaintiff, accompanied by her husband, went to Fireside to purchase a Chrysler Laser. At the time, plaintiff owned a 1983 Buick Regal which she planned to use as a trade-in on a new Laser. At Fireside plaintiff spoke with Mike Nicolosi, a salesman, who showed her new Lasers. Plaintiff testified that after finding a car she liked, she and Nicolosi agreed on a price for it. Later, Nicolosi would testify that a document, listing the agreed price and signed by plaintiff and him, was a worksheet and not a binding agreement. According to Nicolosi, the final contract to purchase a car was completed in the finance department.

After reaching an agreement regarding the price of the new Laser, plaintiff spoke with defendant Roy Jacobsen, who introduced himself as a finance manager with Fireside. While talking with Jacobsen, plaintiff expressed an interest in obtaining her own financing because she thought Fireside's finance rates were too high. Plaintiff said that Jacobsen had "no problem" with this decision, telling plaintiff that she had the option of finding her own financing or financing the Laser through Fireside. Jacobsen had plaintiff sign a promissory note, stating that she had seven days in which to obtain her own financing.

According to plaintiff, she signed a contract on July 12 for the purchase of the Laser. As set forth in the agreement, the trade-in value of plaintiff's Buick Regal was $7,865, and the balance still owed was $6,755.13, leaving a net equity in the Regal of $1,109.87. Plaintiff acknowledged signing other documents on July 12, a buyer's order and invoice form reflecting a cash deal rather than a finance transaction, an extended warranty in the amount of $399, and a delivery receipt. Jacobsen's signature or initials appeared on each of these documents. Additionally, plaintiff filled out a credit application while in

Jacobsen's office. Eventually, plaintiff left Fireside with the Laser; she left her 1983 Buick Regal at Fireside.

On the following Monday after failing to obtain financing at three different banks, plaintiff returned to Fireside. At that time she told Jacobsen that she wanted to finance the Laser through Fireside. Plaintiff testified that Jacobsen told her to come back tomorrow because he was "too busy." The next day, Tuesday, plaintiff returned to Fireside. According to plaintiff, Jacobsen again told her he was too busy; he asked plaintiff to phone him on Wednesday. Plaintiff stated that when she telephoned Jacobsen on Wednesday, he told her that he would have "everything ready" on Friday evening. It was plaintiff's testimony that when she met with Jacobsen on Friday, he announced that he had made a "mistake" and had to increase the price of the Laser by $1,000.

Plaintiff related that she told Jacobsen that she did not have the $1,000. He stated that she would have to buy a cheaper or used car. Plaintiff said that she told Jacobsen, "No, I would rather have my used car back" and that Jacobsen replied, "Well, I'm sorry. You're going to have to buy another car."

Plaintiff recalled that a salesman showed her husband and her other cars on Fireside's lot, but she did not see anything she liked. The salesman offered to show her the cars in Fireside's used car lot. Plaintiff testified that she told the salesman, "I don't want a used car. I would rather have my used car back." According to plaintiff, the salesman replied, "It's gone." Finding no other car she wanted to buy, plaintiff made arrangements with the salesman to return on Monday morning to look at the used cars Fireside would obtain on the weekend.

On Monday morning plaintiff telephoned her lawyer, James Guthrie, to seek his advice regarding the car purchase. According to plaintiff, Guthrie advised her to proceed to Fireside and to let him know what happened. Upon her arrival at Fireside, plaintiff recalled that she met with Jacobsen, who told her that if she could not supply the extra $1,000 needed for the purchase of the Laser, he could add it into the financing of the car. Jacobsen produced a retail installment contract and said, according to plaintiff, "Now, Goddam it, sign it." Plaintiff recalled that she told Jacobsen she wanted her lawyer to look over the agreement whereupon Jacobsen picked up the contract, tore it up, and threw it in the garbage. Later in the trial, Fireside would enter into evidence a document which it alleged was the contract Jacobsen had asked plaintiff to sign.

Plaintiff said she asked Jacobsen if she could use his telephone; he refused. Plaintiff used the public telephone in the service area to try to phone Guthrie. When she could not reach him, she called a friend, Nick Consold, a sales manager at McGrath Buick, who advised her to leave Fireside. Plaintiff stated that she walked outside to the place where she had parked the Laser and found it blocked in by two other cars. According to plaintiff, five salesmen were standing around the car, laughing. She returned to the showroom, observing Jacobsen in the front window laughing at her. Plaintiff recalled that she handed Jacobsen the keys to the Laser and then walked home from the dealership, a distance of approximately 10 miles.

Plaintiff testified that she never saw her 1983 Buick Regal again nor the 1985 Laser. Also, Fireside never sent her $1,100, the difference between the price of the trade-in on the Buick and the amount remaining to be paid off on that car. Plaintiff subsequently contacted her lawyer, Guthrie, who wrote Fireside a letter, demanding $1,100. According to plaintiff, Fireside never responded to Guthrie's letter.

A few days after plaintiff left the Laser car keys with Jacobsen she purchased a car from McGrath Buick. Her friend Nick Consold set up the deal for her. Plaintiff had to borrow money from her parents to put down on the car. Plaintiff denied telling Jacobsen that she did not want the Laser because she could obtain a better deal from Consold.

Roy Jacobsen testified that he worked for Fireside from 1982 to 1985, first as a salesman, then as a used car manager, and finally in the finance office as a biller. Jacobsen stated that he never worked for Fireside as a finance manager and never told customers that he was a finance manager. Later, Jacobsen recanted this testimony, stating that on occasions he used the term "finance manager" and that occasionally he was introduced to customers as a finance manager. He admitted that no one at Fireside authorized him to use this title.

Jacobsen related that as a biller he prepared the documents necessary for delivery of an automobile to a customer, such as rust proofing and warranty contracts, license and title papers for the Secretary of State, and financing contracts. Jacobsen stated that he was authorized to sign these documents for Fireside. Jacobsen recalled that Jack Carroll, vice-president of finance, looked over all the documents after Jacobsen prepared them to make certain that the paper work was correct and accurate. Jacobsen stated that he knew he was preparing contracts and that it was important to be honest with the public. According to Jacobsen it was the policy of Fireside to treat its customers honestly, courteously, and kindly.

Jacobsen remembered his meeting with plaintiff regarding the purchase of the 1985 Laser. When plaintiff met with Jacobsen, the price of the car had already been established by the salesman with whom she had dealt. Jacobsen said the document prepared by the salesman was a buyer's order and invoice from the sales department and did not constitute a contract even though the document set forth the names of the purchaser and seller, the sale price of the car, the description of the trade-in vehicle, the net equity on the trade-in vehicle, and the VIN number of the new automobile. Jacobsen was asked to read the print above the signature of the salesman, Mike Nicolosi, which stated that the order comprised the "entire agreement" affecting the purchase of the automobile. Jacobsen acknowledged that this statement meant that the document constituted the agreement between the parties and that no other agreement would be accepted.

Jacobsen recalled that he sold plaintiff an extended warranty on the Laser. Jacobsen acknowledged that this warranty was in effect at the same time as the standard new car warranty on the car. It was Jacobsen's testimony that the extended warranty provided more coverage than the standard warranty. Jacobsen admitted that Fireside made a profit from the sale of extended warranties.

Jacobsen testified that plaintiff and he discussed financing the Laser. Since Fireside was a Chrysler agency, it offered financing through Chrysler Credit Corporation (CCC). Plaintiff and Jacobsen discussed payments and conditions under this plan. Jacobsen said that plaintiff did not like the interest rates offered by CCC and decided to obtain financing elsewhere. Consequently, the purchase of the car became a cash transaction, and Jacobsen gave plaintiff the paper work needed for her to obtain financing from a lending institution. Jacobsen stated that he told plaintiff she had the alternative of obtaining financing through CCC if she wanted. Jacobsen agreed that whether plaintiff obtained financing through CCC or elsewhere, the agreed purchase price of the Laser would remain the same and not change from one contract to another. Additionally, the price offered for her trade-in vehicle was set and would not change.

Jacobsen related that plaintiff left the Buick Regal at the dealership on July 12, the night she agreed to purchase the Laser. Documents entered into evidence showed that plaintiff's Regal was sold the very next day, July 13.

Jacobsen acknowledged that on July 12 plaintiff signed many documents; some had to be signed in four or five places. Jacobsen said he explained each paper to plaintiff and gave her the opportunity to read each one. Jacobsen identified the promissory note which he prepared

for plaintiff's signature. He recalled that plaintiff read the note to herself and that he also read the note to her, showing her the balance due on the note before she signed. According to the note, plaintiff had seven days to obtain financing.

Jacobsen did not recall speaking with plaintiff on the telephone during the seven-day period, nor did he recall plaintiff returning to Fireside within two or three days to seek financing with CCC. Jacobsen did not remember twice telling plaintiff she was to come back the next day because he was too busy. Later, Jacobsen would testify that he must have had a conversation with plaintiff sometime within the seven-day period because he tried to get financing for her during that time. Jacobsen recalled talking with Carroll about contacting CCC to see what it would require to finance the Laser. It was Jacobsen's testimony that after Carroll contacted CCC, he told Jacobsen a total down payment of $2,000 was required.

When plaintiff returned to Fireside after the seven-day period had expired, she was, by Jacobsen's testimony, "sort of mad" because she could not obtain her own financing and knew that her payments would be higher through Fireside. It was Jacobsen's testimony that plaintiff told him she did not want the Laser because the payments were too high. Plaintiff told Jacobsen she wanted her own car back. Jacobsen told her it had been sold. According to Jacobsen, plaintiff became mad, dropped the Laser keys on his desk, and left the dealership. Jacobsen denied that the Laser was blocked in by other cars and that he laughed at plaintiff. Jacobsen said that plaintiff's leaving was not a funny matter, as it cost him a commission.

After plaintiff left Fireside, Jacobsen said he discussed plaintiff's unhappy state with Carroll, who told Jacobsen that he would telephone plaintiff and try to work the matter out. Jacobsen did not know whether Carroll spoke with plaintiff.

It was Jacobsen's testimony that he did not do anything wrong in his transaction with plaintiff. According to him, he never told plaintiff that she had to pay more money for the Laser when she returned to Fireside to obtain financing. While Jacobsen acknowledged that the figures on the original agreement prepared by salesman Nicolosi, pertaining to the cash price of the Laser and the amount allowed for the trade-in vehicle, differed from the figures on the retail installment contract prepared by Jacobsen when plaintiff returned to Fireside, Jacobsen maintained that the unpaid balance on both documents remained the same. Jacobsen related that because plaintiff could not afford $1,000 more down on the Laser, Fireside raised the trade-in allowance for her car by $1,000 to compensate. The list price then

also had to be raised $1,000, but the cost of the car, according to Jacobsen, was the same. Jacobsen testified that when plaintiff came into Fireside on July 22 to discuss the financing of the car, she told Jacobsen to keep the car. Jacobsen denied swearing at plaintiff and telling her to sign the retail installment contract when he presented it to her.

Jack Carroll testified that he worked at Fireside from September 1980 to about July 1987, first as a biller and then as head of the finance department. Carroll admitted that he created the title of "vice president of finance," which appeared on his business cards, and that no one at Fireside authorized him to use the title. Carroll related that the billers in his department referred to themselves as finance managers.

Carroll stated that Jacobsen had been authorized to sign contracts on Fireside's behalf and that, under Carroll's supervision, Jacobsen was authorized to use the title "manager" when he was signing documents. According to Carroll, Jacobsen was a satisfactory employee, who conducted himself properly in dealing with customers and, to Carroll's knowledge, had never done anything dishonest during the time he worked under Carroll's supervision. Carroll admitted that he knew there had been allegations of Jacobsen's dishonesty in the instant case and in other cases by individuals represented by plaintiff's lawyer.

Carroll recalled that Fireside had received a letter from the Attorney General's office regarding a complaint it had received from plaintiff. Rick Weissberg, one of Fireside's owners, told Carroll to investigate the complaint. Carroll identified a letter dated January 29, 1986, which he sent to the Attorney General's office in response to its letter. It was Carroll's testimony that his letter was prepared by Fireside's manager of customer relations. Carroll acknowledged that he had read the letter to make sure the contents were correct. Carroll admitted that the fourth paragraph of the letter, stating that plaintiff had not divulged to Fireside on July 12, 1985, that a large sum was still owed on her trade-in vehicle, was not true. According to Carroll, he never sent another letter to the Attorney General's office to correct the mistake because he did not realize the error until he reread the letter prior to his testifying at trial.

Carroll recounted that, prior to the letter from the Attorney General, Fireside had received a letter from plaintiff's lawyer, James Guthrie. It was Carroll's testimony that he telephoned Guthrie and explained that it was impossible to return plaintiff's Regal since it had been sold but that Fireside would pay plaintiff $1,100, the difference between the trade-in allowance on the Regal and the amount

owed on the vehicle. Carroll said he told Guthrie that, in return, he wanted a release from plaintiff as to any future claims. According to Carroll, Guthrie responded that he did not know whether Carroll's proposition was satisfactory. Guthrie would later testify that he never received any response, written or oral, to his letter to Fireside, that he never spoke with Carroll, and that no one from Fireside made an offer to him to pay plaintiff $1,100.

Carroll acknowledged that it was a common practice among car dealers to sell trade-in vehicles before the dealers acquired titles to the vehicles. Carroll also acknowledged that it was a common practice in the auto industry for an agent of a dealership to sign title papers when it possessed power of attorney for a customer. Earlier, plaintiff had admitted signing a document entitled "POWER OF ATTORNEY" on July 12 but stated that she had not read the document and that no one had explained to her that it gave Fireside the right to sign her name on the title.

Carroll also testified that in the auto industry the prices on trade-in vehicles were often inflated to show equity where it did not really exist.

Allen Gaines, one of the owners of Fireside, testified that Jacobsen worked in the finance and insurance department as a biller. According to Gaines, Jacobsen never was a finance manager and if he used that term on any paper work, it was misleading.

Gaines stated that he knew it was not true that plaintiff was asked to pay an additional $1,000 for the purchase of the Laser. Gaines explained that although the terms of a sale might be changed, the price of a car was never raised after Fireside sold a car. Gaines believed that Fireside had done nothing wrong in dealing with plaintiff. He acknowledged that if his employees kept the Laser and made plaintiff walk home, that conduct would have been improper. Gaines did not think that this occurrence had happened although he admitted that he was not present when plaintiff returned the Laser and did not know who was present.

Gaines stated that he never saw the letter James Guthrie sent to Fireside. Gaines never made an investigation into plaintiff's treatment by Fireside. Gaines was told about the problem by Carroll and by the witness' son, Warren Elisco. According to Gaines, if plaintiff had contacted the dealership management regarding her problem, Gaines, Weissberg, or Elisco would have straightened out the problem.

Gaines was shown Carroll's letter to the Attorney General's office and acknowledged that Carroll was not vice-president of finance as stated in the letter. Gaines testified that the fourth paragraph, refer-

ring to plaintiff's failure to divulge to Fireside that she owed money on her trade-in vehicle, was "totally erroneous." According to Gaines, Fireside knew that plaintiff owed money on the car. Gaines stated that he had never seen Carroll's letter before trial.

Gaines testified that it was an accepted practice in the auto industry to inflate the price of a trade-in vehicle in order to show a customer had equity in the vehicle when he really did not. Gaines said that dealers do this so the customer can obtain financing. Gaines disclosed that lending institutions are aware of this procedure. Gaines insisted that, despite any increase in the trade-in allowance or selling price of a car, the amount to be financed or paid on a car, as agreed to by a customer, never changed.

Gaines, who had been seriously ill and often absent from the dealership during the time of the incident involving plaintiff, was later dismissed from the lawsuit on his motion for a directed finding.

Rick Weissberg, the other owner of Fireside, testified that he acted as vice-president of Fireside, overseeing the sales and service departments, purchasing cars, and running the day-to-day business of the dealership. Weissberg stated that he first became aware of the situation with plaintiff when she filed her lawsuit. At that time Weissberg conducted his own investigation of plaintiff's transaction; he recalled that he spoke with Carroll, Jacobsen, and Elisco. Weissberg could not specifically remember what each told him. Basically, they all related that plaintiff purchased an automobile and decided that she could get better financing of the car on her own rather than through Fireside. As a result, Fireside billed the purchase as a cash transaction. According to Weissberg, plaintiff returned to Fireside about a week later saying that she did not want the car. Plaintiff returned the keys and left the dealership.

Weissberg testified that he never spoke with plaintiff. It was his belief that plaintiff was dishonest with Fireside because she did not keep her end of the bargain. Weissberg pointed out that, by plaintiff's own admission, she did not seek out either Gaines or himself or another person in charge to solve the problem she had with her transaction with Fireside. Weissberg opined that plaintiff did not really want to solve her problem.

When asked if anyone at Fireside did anything wrong, Weissberg replied that Carroll made a mistake in the letter he wrote to the Attorney General's office. Additionally, Weissberg said that his employees made a mistake by not bringing plaintiff's problem to the attention of Gaines or of himself. But, Weissberg said, plaintiff also made mistakes.

Weissberg testified that the original document filled out by salesman Mike Nicolosi and signed by Nicolosi and plaintiff was in the nature of a work order. It represented the basic agreement that the customer and salesman reached. A second document entitled "Buyer's Order and Invoice" and signed by plaintiff and Jacobsen was prepared when plaintiff elected to do a cash transaction for the purchase of the Laser. Weissberg stated that a third document, a retail installment contract which was unsigned and dated July 22, 1985, reflected a raise in the amount of money allowed on plaintiff's trade-in vehicle so that she would be able to obtain financing from CCC. Weissberg pointed out that the most important item on all three documents was the money to be paid for the Laser and that that amount remained the same even though the other figures on the documents changed. Weissberg stressed that plaintiff was not asked to pay more money for the car.

Erwin Sirovy, branch manager of CCC, testified that the financing CCC provided for an individual purchasing a car was based on the creditworthiness of the individual applying for credit and/or the amount of money requested. Sirovy stated that CCC and not a dealership decided who would receive a loan.

Sirovy also testified that it was customary in the automobile industry for a dealer to raise the value of a trade-in vehicle when a finance company, such as CCC, determined that a purchaser needed a larger down payment.

At the conclusion of the trial, the jury returned a verdict in plaintiff's favor and against Fireside on the conversion count in the amount of $1,155 in compensatory damages and $1,250 in punitive damages. The jury found in favor of the individual defendants, Jacobsen, Carroll, and Weissberg.

Subsequently, the court conducted a hearing on the consumer fraud count. The court found that Fireside had violated section 2C of the Consumer Fraud Act. Also, the court found that the elements of section 2 pertaining to unlawful practices were present in two specific instances in the instant case: the sale of an extended warranty on the Laser and the failure of Fireside to return plaintiff's used car or the equity in the car. On this latter point, the court specifically commented that it found unbelievable Carroll's testimony that Fireside offered to return the equity in the car to plaintiff. The court awarded plaintiff $750 for aggravation and inconvenience.

On January 9, 1991, the court conducted a hearing on plaintiff's petition for attorney fees. At the conclusion of the hearing, the court found that, due to its determination that there had been a willful vio-

lation of the Consumer Fraud Act (Ill. Rev. Stat. 1989, ch. 121½, par. 262C), plaintiff was entitled to reasonable attorney fees in the amount of $31,368.75 and costs in the amount of $1,284.

This appeal ensued.

Fireside first contends that the trial court erred in finding that it violated the Consumer Fraud Act. The trial court specifically found that a direct violation of section 2C of the Consumer Fraud Act occurred. (Ill. Rev. Stat. 1989, ch. 121½, par. 262C.) Section 2C provides:

> "If the furnishing of merchandise, whether under purchase order or a contract of sale, is conditioned on the consumer's providing credit references or having a credit rating acceptable to the seller and the seller rejects the credit application of that consumer, the seller must return to the consumer any down payment, whether such down payment is in the form of money, goods, chattels or otherwise, made under that purchase order or contract and may not retain any part thereof. The retention by the seller of part or all of the down payment, whether such down payment is in the form of money, goods, chattels or otherwise, under those circumstances as a fee for investigating the credit of the consumer or as liquidated damages to cover depreciation of the merchandise which was the subject of the purchase order or contract or for any other purpose is an unlawful practice within the meaning of this Act, whether that fee or those charges are claimed from the down payment, whether such down payment is in the form of money, goods, chattels or otherwise, or made as a separate charge to the consumer." Ill. Rev. Stat. 1989, ch. 121½, par. 262C.

■ Fireside claims this section is inapplicable to the instant case because CCC and not Fireside provided financing for automobiles purchased through Fireside and, therefore, it was not Fireside as the "seller" who rejected plaintiff's credit application but CCC, which was a separate entity. Fireside ignores several important facts. First, the credit application filled out by plaintiff on July 12, 1985, the date of her original transaction with Jacobsen clearly states, "The undersigned hereby authorizes *selling dealer* or Chrysler Credit Corporation to initiate a credit investigation based upon the above information." (Emphasis added.) Second, the retail installment contract prepared by Jacobsen, allegedly, on July 22, 1985, designates the "Creditor" as Fireside. Third, both Jacobsen himself and plaintiff testified that Jacobsen told plaintiff she had the option of obtaining financing for the Laser through Fireside if she was unable to obtain

her own financing as she originally planned. These facts imply that Fireside was involved in the rejection or acceptance of plaintiff's credit application, even if only indirectly.

When plaintiff was unable to obtain her own financing, she returned to Fireside and told Jacobsen she wished to finance through the dealership. Twice, on July 15 and on July 16, Jacobsen told plaintiff he was "too busy" and to return the next day. On July 17, plaintiff telephoned Jacobsen regarding the financing. At that time he told her to come into Fireside on Friday, July 19, and that he would have "everything ready" on that evening. At first, Jacobsen testified that he did not recall any conversation with plaintiff during this period of time. Later, he admitted that he must have had a conversation at some point during this seven-day period because he knew he tried to get financing for plaintiff.

Plaintiff testified that when she returned to Fireside on Friday, July 19, Jacobsen told her he had made a "mistake" and that the total price of the car was $1,000 more. Thus, she needed to put $1,000 more down on the financing. It was plaintiff's testimony that when she indicated she did not have the $1,000, Jacobsen told her that she would have to buy a cheaper or used car. By this statement, Jacobsen indicated that unless plaintiff could give Fireside an additional $1,000 it was rejecting her application for credit. At that point, Fireside, under the terms of section 2C of the Consumer Fraud Act, was required to return plaintiff's down payment, *i.e.*, her used car. However, when plaintiff expressed a desire to have her used vehicle returned, that desire was refused by Jacobsen. Fireside's failure to return plaintiff's car, or to return the equity in the car, constituted a violation under section 2C.

■ Moreover, Jacobsen's attempt to change the terms of Fireside's original agreement with plaintiff constituted a violation of section 2 of the Consumer Fraud Act, which prohibits any deception, false promise, or misrepresentation made in the course of conduct involving a trade or commerce. (Ill. Rev. Stat. 1989, ch. 121½, par. 262.) A violation of section 2 is established if a plaintiff shows that a defendant is engaged in a trade or commerce and has committed acts or engaged in practices which are either unfair or deceptive. *Ekl v. Knecht* (1991), 223 Ill. App. 3d 234, 239.

Jacobsen maintained that the document prepared by salesman Nicolosi did not constitute a contract, implying thereby that the figures could be changed. However, pursuant to the terminology on the document stating that the order comprised the "entire agreement" affecting the purchase of the automobile, Jacobsen was forced to acknowl-

edge that the document constituted the agreement between plaintiff and Fireside and that no other agreement would be accepted. Additionally, although Jacobsen testified that the agreed purchase price of the Laser would remain the same and not change from one contract to another, he had, by plaintiff's testimony, changed that price when she returned on July 19. Also, despite Jacobsen's claim that the price offered for plaintiff's trade-in vehicle would not change once it was written into the agreement, the price set forth in the retail installment agreement differed by $1,000 from that quoted in the original agreement prepared by Nicolosi.

The testimony presented by plaintiff and Jacobsen was clearly contradictory. Where the testimony is contradictory, the trial judge as the trier of fact is in a position superior to this court of review to determine the credibility of the witnesses, to weigh the evidence, and to determine the preponderance thereof. *In re Marriage of Frederick* (1991), 218 Ill. App. 3d 533, 537.

Here, the trial judge's decision to believe plaintiff rather than Jacobsen was justified. Jacobsen's testimony showed he was an individual given to misrepresentations, beginning with his misstatement to plaintiff that he was a finance manager for Fireside. At trial Jacobsen stated he never worked for Fireside as a finance manager and never told customers he was a finance manager. Later, he recanted that testimony, admitting that he had used the title of finance manager on certain occasions and had occasionally been introduced to customers as a finance manager. Jacobsen's testimony and that of Allen Gaines, one of Fireside's owners, showed that Jacobsen was never authorized by Fireside to represent himself as a finance manager. By Jacobsen's own admission, he referred to himself in this manner because it was the position he wanted.

Presenting himself as a finance manager, however, created an impression with a customer that Jacobsen was directly involved in the financing process and lent credence to Jacobsen's representation that Fireside would be able to obtain financing for the customer based on the agreement made with that customer. Even if Jacobsen did not intend to deceive plaintiff by his misrepresentations, that intent is not necessary to create a violation under the Consumer Fraud Act. *Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 574.

We have recently articulated that the elements of a statutory fraud claim are (1) a statement by the seller; (2) of an existing or future material fact; (3) that was untrue, without regard to defendant's knowledge or lack thereof of such untruth; (4) made for the purpose of inducing reliance; (5) on which the victim relies; and (6) which re-

sulted in damages to the victim. (*Duran v. Leslie Oldsmobile, Inc.* (1992), 229 Ill. App. 3d 1032.) The standard of proof required is lenient (*Eshaghi v. Hanley Dawson Cadillac Co.* (1991), 214 Ill. App. 3d 995, 1002), and a single transaction is sufficient to establish a claim under the Consumer Fraud Act (*Warren*, 142 Ill. App. 3d at 568).

■ Here, plaintiff relied on the representations by Nicolosi and Jacobsen regarding the price of the new Laser and that her trade-in vehicle was sufficient as a down payment. She left her used car at Fireside on July 12 and took possession of the Laser believing that the Laser was hers, that the terms of her purchase agreement were set, and that if she needed to finance through Fireside it would be on the basis of the terms of the agreement as quoted by Nicolosi. That was not true as plaintiff learned when she returned to Fireside on July 19 to arrange for financing. Based on Fireside's deceptive statement of a material fact, *i.e.*, that the parties had a contract and that Fireside could obtain financing for that contract, and plaintiff's reliance thereon, she was damaged. Plaintiff had given her used car as down payment; that car, in turn, had been sold on July 13, the day following plaintiff's original transaction with Fireside, and could not be returned to her.

Despite Jack Carroll's testimony that Fireside had attempted to return to plaintiff the equity in her car, since it could not return the car itself, plaintiff testified that Fireside never sent her the money. Additionally, James Guthrie, plaintiff's attorney, testified that he received no oral or written response from anyone at Fireside when he sent Fireside a letter demanding the return of plaintiff's car.

Carroll's credibility was doubtful. For example, testimony indicated Carroll represented himself as Fireside's vice-president of finance and that he even had business cards with this title printed on them. Yet, the evidence showed that Carroll was not authorized by the owners of Fireside to use such title. In fact, Carroll admitted making up the title. Additionally, testimony and evidence showed that, in responding to a letter from the Attorney General's office regarding a complaint from plaintiff, Carroll deliberately lied about Fireside's transaction with plaintiff.

Based on the testimony of Jacobsen and Carroll, we do not believe the trial court erred in finding that Fireside violated the Consumer Fraud Act.

■ The trial court also found that Fireside's act of selling plaintiff an extended warranty on the brand new Laser constituted a violation under the Consumer Fraud Act. Jacobsen acknowledged that the Borg Warner extended warranty, which was part of Fireside's original

agreement with plaintiff, covered the same period covered by the standard new car warranty, which came with the Laser. Jacobsen maintained that the extended warranty complemented Chrysler's standard new car warranty but also admitted that Fireside made a profit by selling the extended warranties.

Fireside contends that since plaintiff never signed the revised purchase agreement, she never bought the extended warranty and, therefore, plaintiff failed to prove she was damaged by this allegedly deceptive act. We agree. Under the Consumer Fraud Act, plaintiff was required to show she suffered damages as a result of Fireside's act of selling her the extended warranty. (*Greenberg v. United Airlines* (1990), 206 Ill. App. 3d 40, 46.) Here, where plaintiff never paid for the extended warranty she failed to prove she was actually harmed.

■ Nevertheless, as mentioned above, a single transaction is sufficient to establish a claim under the Consumer Fraud Act. (*Warren*, 142 Ill. App. 3d at 568.) Here, plaintiff was misled by Fireside into believing that her trade-in vehicle was ample down payment for the new Laser and that Fireside could arrange financing for her if she needed it. When this representation proved to be untrue and Fireside failed to sell plaintiff the new Laser based on the terms of the original agreement or to return her used car or the equity in it, a direct violation of the Consumer Fraud Act occurred and resulted in damage to plaintiff. Accordingly, the trial court did not err in awarding plaintiff damages under the Consumer Fraud Act in the amount of $750 for aggravation and inconvenience.

Fireside next contends that the trial court abused its discretion in its award of attorney fees to plaintiff. Section 10a(c) of the Consumer Fraud Act (Ill. Rev. Stat. 1989, ch. 121½, par. 270a(c)) provides that the court may award attorney fees to the prevailing party. The decision whether fees should be awarded under the Consumer Fraud Act and in what amount rests within the sound discretion of the trial court. *Ekl v. Knecht* (1991), 223 Ill. App. 3d 234, 245; *Warren*, 142 Ill. App. 3d at 582.

Fireside relies on this court's ruling in *Chesrow v. Du Page Auto Brokers* (1990), 200 Ill. App. 3d 72, to argue that when the basis of a petition for attorney fees is the Consumer Fraud Act, an award can only be made for the fees incurred pursuant to the count filed under the Consumer Fraud Act. (200 Ill. App. 3d at 77-78.) Plaintiff maintains that the issue of her attorney's failure to distinguish the time spent on each count of the complaint has been raised by Fireside for the first time on appeal and is, therefore, waived. However, the rule of waiver is a limitation on the parties and not on the courts, and a

reviewing court may ignore the waiver rule in order to achieve a just result or maintain a uniform body of precedent. (*In re Marriage of Bennett* (1985), 131 Ill. App. 3d 1050, 1055; *Diversified Computer Services, Inc. v. Town of York* (1982), 104 Ill. App. 3d 852, 853.) As our finding in *Chesrow* has precedential value here, we elect to consider Fireside's argument based on differentiation of fees.

In the instant case, plaintiff filed an action under both common-law conversion and the Consumer Fraud Act (Ill. Rev. Stat. 1989, ch. 121½, par. 261 *et seq.*). Plaintiff's petition for fees and the accompanying time slips as well as the testimony presented by plaintiff's attorney at the hearing on the petition failed to differentiate what part of plaintiff's attorney's work was spent on the statutory fraud issue. We note that plaintiff's attorney, here, was one of plaintiff's attorneys in the *Chesrow* case and, therefore, had been previously informed by this court that time spent on a consumer fraud count must be specifically delineated where a prevailing party petitions for attorney fees under the Consumer Fraud Act.

We, therefore, reverse the award of attorney fees and remand this matter for a new hearing on the issue of fees to allow the trial court the opportunity to consider the evidence, if any, of what portion of plaintiff's attorney's work corresponded to plaintiff's claim of consumer fraud. The other arguments which Fireside raises regarding attorney fees were properly considered and rejected by the trial court and, thus, should not be considered on rehearing.

For the reasons stated above, the judgment of the circuit court of Du Page County is affirmed on the issue of consumer fraud and reversed on the issue of attorney fees, and the cause is remanded for further proceedings consistent with the views expressed herein.

Affirmed in part; reversed in part and remanded.

GEIGER and NICKELS, JJ., concur.