FALCON ASSOCIATES, INC., Plaintiff and Counterdefendant-Appellee and Separate Appellant, v. WENDELL COX *et al.*, Defendants and Counterplaintiffs-Appellants and Separate Appellees (Robert G. Wolfe *et al.*, Counterdefendants-Appellees and Separate Appellants).

Fifth District    No. 5—96—0847

Opinion filed August 14, 1998.—Rehearing denied September 18, 1998.

654

Timothy J. Bates, of Bates Law Firm, of Belleville, for appellants.

Edward J. Kionka, of Carbondale, for appellees.

JUSTICE GOLDENHERSH delivered the opinion of the court:

This appeal centers around a new home with a final purchase price of $227,387.54 built by plaintiff-counterdefendant, Falcon Associates, Inc., for defendants-counterplaintiffs, Wendell Cox and Mary Jean Love. Cox and Love (buyers) appeal from the St. Clair County circuit court's order rejecting their claim that Falcon Associates, Inc., along with other counterdefendants, Robert G. Wolfe and Falcon Land Company (collectively, sellers), violated the Illinois Consumer Fraud and Deceptive Business Practices Act (the Act) (815 ILCS 501/1 *et seq.* (West 1994)). Sellers appeal the circuit court's judgment in the amount of $222,896.77, entered after a jury returned a verdict for buyers in that amount. The appeals were consolidated. On appeal, buyers contend that (1) the home builder's promise to provide a house with a certain amount of insulation (R-19) and the subsequent failure to deliver that amount is fraudulent and entitles buyers to remedies under the Act, (2) a home builder's failure to take reasonable steps to ensure compliance with applicable codes is fraudulent and entitles a buyer to the remedies of the Act, and (3) the delivery of a residential building in substantial noncompliance with contractual promises is fraudulent and entitles a buyer to the remedies of the Act. In their appeal, sellers contend that (1) the trial court erred in refusing to dismiss counts IV and V of buyers' counterclaim and in entering judgment

against Robert G. Wolfe and Falcon Land Company because piercing the corporate veil of the contracting party, Falcon Associates, Inc., was not justified and (2) the damages awarded buyers on the breach of contract claim were excessive, improper, speculative, and erroneous. We affirm in part as modified, reverse in part, and remand with directions.

## I. FACTS

On September 12, 1993, buyers signed a contract with Falcon Associates, Inc., for the construction of a residence at 1010 Thornbury in Thornbury Hill subdivision, located in O'Fallon. Robert G. Wolfe was president of Falcon Associates, Inc. Buyers' decision to sign a contract with this home builder was due in large part to the quality of construction shown in the builder's model homes in the subdivision. Mary Jean Love testified that she and her husband toured two model homes built by sellers and were impressed with the quality of those homes. Wolfe admitted that the model homes were intended as a reliable indicator of the general construction quality of homes that would be built by sellers.

The contract called for a two-story, 2,753-square-foot home with a basement, in which "all work [would] be performed in a workmanlike fashion consistent with applicable building codes." The contract called for the home to be completed on January 14, 1994; however, the closing did not occur until March 29, 1994. Even at that late date, the home was not finished, and buyers were given a list of incomplete items, which sellers promised to complete in the near future. Buyers moved in after the closing date and immediately began to experience problems with the house.

One of the first things noticed by buyers was that the wind blew through the home, even with all windows and doors shut. This caused a draft strong enough to blow papers and napkins off tables and onto the floor. Buyers also experienced numerous water problems. For example, windows and doors leaked when it rained; water from an upper-floor bathroom pooled in a kitchen light fixture; the upper-floor master bedroom ceiling leaked, causing the mattress and furniture in that bedroom to be soaked; and water flowed into the basement from outside during rains. Pictures exhibiting the extent of these problems were introduced by buyers.

The builder was made aware of problems as they arose. Between March 30, 1994, and July 19, 1994, Doren Rakers (sellers' superintendent) and other employees of sellers and subcontractors made at least 31 visits to the home in question, attempting to repair the house. Sellers' *own* records indicate numerous leaks and other problems found at

the house, and the records indicate attempts to correct the situation. For example, sellers' records indicate leaks in the basement, the utility room, the library, the living room, and the garage and at various windows throughout the house, including a front bay window.

Mary Jean Love testified that it was not her or her husband's contention that sellers did not try to fix things but, rather, they were complaining of sellers' lack of accomplishment. As soon as one thing was fixed, it would rain again and the problem would be back or a new problem would be discovered. The litigation began after buyers placed signs in the windows of their home which read, *inter alia*, "Please fix this home," "Please fix our lawn," and "Water damag[e]." Wolfe testified that he could not understand why these signs had been posted because he was attempting to fix the problems and had directed his employees to get the house fixed so buyers would be happy. Wolfe did not want his reputation damaged.

On August 4, 1994, Falcon Associates, Inc., filed suit against buyers for damage to sellers' business caused by the posting of the signs. Wolfe testified the signs caused a significant decrease in his business in 1994 and 1995. A local real estate agent, Judy Dempcy, also testified that the signs adversely affected sales in the Thornbury Hill subdivision. Buyers denied any liability and filed a counterclaim. Count I was for breach of contract. Count II was a negligence claim. Count III was a claim under the Act. Falcon Associates, Inc.'s original claim was dismissed. Thereafter, an amended complaint was filed.

On February 20, 1996, buyers filed a motion to amend their counterclaim to add counts against the shareholders of Falcon Associates, Inc., and against Falcon Land Company on the ground that Falcon Associates, Inc., was a "sham" corporation and had transferred all its assets to Falcon Land Company. This amendment was allowed, and a first amended counterclaim was filed adding a count against Robert G. Wolfe individually and Falcon Land Company.

At trial, each side called an expert to testify about the problems and defects in the home and how to correct them. Buyers called Leroy Dawson, a licensed architect and experienced general contractor, who first inspected the home after Falcon Associates, Inc., filed the original action. Dawson discovered numerous problems and shoddy workmanship. His preliminary report concluded "that a building with this magnitude of visible defects will have many latent defects." Because of Dawson's preliminary report, buyers proceeded with their own suit against sellers. Ultimately, Dawson discovered, *inter alia*, incorrectly installed, undersized, and improperly sealed plumbing; the lack of a vapor barrier between the concrete basement floor and the ground, as per the guidelines of the Building Official Code Administration (BOCA)

code; no reinforced flooring under the main support wall, as per the BOCA code; an uneven basement floor; inadequately designed floor joists; and an I-beam that measured only 4 inches rather than 8 to 12 inches, as required by the BOCA code. Dawson also found inadequate flashing of valleys and chimneys, as per the BOCA code; improperly installed roofing shingles, in violation of both the BOCA code and manufacturer's instructions; improper grading, as per the BOCA code, allowing water to seep into the house; improperly supported brick veneer walls; improperly installed air-conditioning units, which were actually leaning at the time of inspection; poor workmanship by brick masons, including not priming and not taking the time to shorten the lentils, resulting in a cracking, uneven foundation; improperly installed siding, which blew off in the wind; improperly installed windows; improperly fabricated and installed chimney caps; incorrectly connected porches; bathroom exhaust vents blocked by insulation; too small a window in an upper-floor guest bedroom, which did not permit egress in case of emergency and, therefore, per the BOCA code, could not be considered a bedroom; furnace vents in the attic in direct contact with wood, in violation of both manufacturer's specifications and the BOCA code; improperly ventilated and nonventilated attic areas; no wall ties holding brick veneer to the exterior of the wall, as per the BOCA code; no building felt between exterior sheathing and brick veneer, in violation of the BOCA code; no fire protection between the garage and the living space, in violation of the BOCA code; improperly installed marble flooring in the foyer; and an improperly installed main gas pipe. Additionally, Dawson testified that the specifications for the house called for R-19 wall insulation, but the manner of construction allowed space for only R-13 insulation, which is of lesser quality. Dawson found only R-13 insulation during his inspection. Dawson recommended, *inter alia*, that the home be reroofed, that the brick veneer be torn off and reinstalled, that the concrete floors be broken up and repoured to create a proper foundation for the support of the wall, and that a steel I-beam be installed to carry the load of the home.

John Page, a structural engineer, testified as an expert for sellers. Page inspected the home after reading Dawson's report and focused on the items in that report. Page disagreed with Dawson as to several items and testified that the repairs necessary to the home would be substantially less than those Dawson believed were necessary. By the time Page inspected the home, the entire roof had already been torn off and replaced as per Dawson's recommendation. Sellers admitted that flashing was questionable at windows and doors and would need to be replaced. They also admitted that there were leaks that would

have to be corrected and that the center bearing wall in the basement needed to be replaced. Sellers submitted testimony that repairs estimated to cost $7,720 were necessary. Buyers, on the other hand, presented testimony that the repairs would cost substantially more.

Tony Pacewic of Pacewic Construction was hired by sellers to perform all repairs, except plumbing. Pacewic testified that the repairs would total $88,050. Stephen Jany, a licensed plumber, testified on behalf of buyers about the numerous plumbing problems in the house. According to Jany, there was a multitude of violations of the BOCA code and, in general, overall bad workmanship. For example, the gas piping was inadequately secured, which was a safety hazard; a vent pipe was not hooked up and was not capped off, allowing sewer gas into the house; the rough-in in the basement for an additional bathroom was configured in such a way that he had "no idea how they plan on putting fixtures in there," and none of the vents were capped off in the rough-in area; the water line in the basement was not large enough; and the laundry room water lines froze when it was below freezing outside. Jany also testified concerning additional repairs. Jany estimated that the repairs would cost $5,628.84.

Mary Jean Love testified that she and her husband would have to move out of the house while such repairs were being done for a period of at least six months. She testified about other miscellaneous items that would have to be done and about the additional costs of heating the home due to the lower-grade insulation that was used. Love, a freelance technical writer, also testified about her lost income. Love testified that her job suffered because of all the time she spent at home allowing repairmen into the house and making sure the repairs were correctly completed. Love's testimony reflected her anxiety and despair over the situation. Love testified that in the first year after the home was constructed, she was unable to attend five job-related conferences. Love missed a conference in San Antonio because of repairs on her house and was unable to receive a refund for an airline ticket previously purchased in the amount of $352. Love testified that conferences are the only marketing tool that she has and that it is at these conferences that she is able to acquire new business. Love testified that it will take her two to three years to reestablish herself in the field as a technical writer. She estimated that her lost income was approximately $60,000.

After both sides rested, the sellers moved for a directed verdict on counts IV and V, alleging that there was insufficient evidence to permit the piercing of the corporate veil to allow judgment against either Wolfe or Falcon Land Company. The trial court denied this motion, and the case was submitted to the jury on Falcon Associates, Inc.'s

claim of intentional interference with prospective business advantage and buyers' counterclaim for breach of contract. The jury was instructed, over sellers' objection, to consider all three counterdefendants as one defendant. In closing, buyers' attorney summarized buyers' damages as follows:

"Homeowners' expenses (testified to by Ms. Love)..41,403.05
Roof replacement and repairs ..........................................8,295.22
Pacewic repair estimate ................................................88,050.00
Jany plumbing................................................................5,628.00
Tarp ...................................................................................400.00
Pacewic work for Dawson.................................................362.50
Dawson estimated fee .....................................................9,200.00
Dawson site management fee..........................................6,000.00
Love's lost wages...........................................................63,206.00
Love's ticket to San Antonio............................................352.00."

The trial court submitted two special interrogatories to the jury, which read as follows:

"SPECIAL INTERROGATORY NO. 1

Did Falcon Associates, Inc.[,] know or should they have known that the House, as delivered to Jean Love and Wendell Cox, was constructed in substantial part[ ] in violation of the applicable building codes?

SPECIAL INTERROGATORY NO. 2

Did Falcon Associates, Inc.[,] intentionally conceal[ ] or misrepresent or omit to tell Jean Love and Wendell Cox that the house was constructed in substantial part[ ] in violation of the applicable building codes?"

The jury answered "Yes" to the first interrogatory and "No" to the second. The jury also returned the following verdict:

"We, the jury, find for Wendell Cox and Jean Love and against Falcon Associates, Inc. We assess the damages in the sum of $222,896.77, itemized as follows:

For reasonable expenses of necessary repairs to the property which was damaged.     $130,897.75

For the value of loss of use of the building for the time reasonably required for the repair.     $ 9,000.00

Other:     $ 82,999.02."

The claim brought by buyers pursuant to the Act was decided by the trial court. The trial court entered judgment in favor of sellers and against buyers under the Act, noting the jury's responses to the special interrogatories, specifically, the jury's negative response to special interrogatory No. 2. Both sides appeal.

## II. ANALYSIS

### A. THE ILLINOIS CONSUMER FRAUD ACT

We first address buyers' contention that the trial court erred in entering judgment in favor of sellers on buyers' claim under the Act. Buyers specifically contend that they are entitled to remedies under the Act because (1) the sellers promised to provide a house with a certain amount of insulation (R-19) and the subsequent failure to deliver that amount is fraudulent, (2) the sellers' failure to take any reasonable steps to ensure compliance with applicable codes is fraudulent, and (3) the delivery of a residential building in substantial noncompliance with contractual promises is fraudulent. Sellers reply that the trial court was correct in its interpretation that this is but a breach of contract case and that the Act does not apply in this situation. Sellers contend that buyers failed to prove any deceptive act or practice and, at most, have only shown a breach of contract. After careful consideration, we believe that the trial court's determination that the Act does not apply should be reversed and the cause should be remanded for further consideration.

The general trend in Illinois has been to allow consumers greater protection by equalizing the contractual relationship between consumers and manufacturers. Nowhere has this been more evident than in the sale of new homes from a builder-vendor to a consumer-purchaser. For example, in *Petersen v. Hubschman Construction Co.*, 76 Ill. 2d 31, 389 N.E.2d 1154 (1979), our supreme court rejected the harshness and injustice of the rule of *caveat emptor* and held that in the sale of a new home by a builder-vendor, there is an implied warranty of habitability which will support a purchaser's action against a builder for latent defects. In so doing, our supreme court eloquently explained the lopsided relationship between the builder-vendor and the consumer-purchaser:

"Many new houses are, in a sense, now mass produced. The vendee buys in many instances from a model home or from predrawn plans. The nature of the construction methods is such that a vendee has little or no opportunity to inspect. The vendee is making a major investment, in many instances the largest single investment of his life. He is usually not knowledgeable in construction practices and, to a substantial degree, must rely upon the integrity and the skill of the builder-vendor, who is in the business of building and selling houses. The vendee has a right to expect to receive that for which he has bargained and that which the builder-vendor has agreed to construct and convey to him, that is, a house reasonably fit for use as a residence." *Petersen*, 76 Ill. 2d at 40, 389 N.E.2d at 1158.

In the instant case, there is no question but that the buyers did

not receive the house they were expecting. Buyers agreed to pay $227,387.54 for a house, but not a house that leaked, required the windows to be replaced within the first year, needed an entire new roof, had wind blowing through it even with all windows and doors shut, and had numerous structural defects, some of which were actually hazardous to the buyers' safety. So many repairs were required that an argument can be made that buyers would have been better off purchasing a 100-year-old home and rehabbing it. The buyers filed a breach of contract case but sought additional consumer protection through the Act in order to make them whole. As the sellers have pointed out, when a party is required to retain an attorney to enforce its contractual rights, that party does not receive full compensation, even when it receives the contract price, because that party is required to pay its attorney and the costs of litigation.

Section 2 of the Act provides in part:

> "Unfair methods of competition and unfair deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact *** in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2 (West 1994).

Section 10a(c) of the Act specifically allows the recovery of attorney fees under the Act. 815 ILCS 505/10a(c) (West 1994). The Act provides broader consumer protection than an action for common law fraud. *Connor v. Merrill Lynch Realty, Inc.*, 220 Ill. App. 3d 522, 581 N.E.2d 196 (1991). Our General Assembly has given a " 'clear mandate *** that the courts *** are to utilize [the Act] to the utmost degree in eradicating all forms of deceptive and unfair business practices and to grant appropriate remedies to defrauded consumers.' " *Warren v. LeMay*, 142 Ill. App. 3d 550, 563, 491 N.E.2d 464, 472 (1986), quoting *American Buyers Club of Mt. Vernon, Ill., Inc. v. Honecker*, 46 Ill. App. 3d 252, 257, 361 N.E.2d 1370, 1374 (1977). The terms of the Act are incapable of precise definition; accordingly, whether a given set of circumstances is unfair or deceptive must be determined on a case-by-case basis. *People ex rel. Fahner v. Walsh*, 122 Ill. App. 3d 481, 484, 461 N.E.2d 78, 81 (1984). The Act is to be broadly applied and liberally construed. *Walsh*, 122 Ill. App. 3d at 486, 461 N.E.2d at 82. The decision to award attorney fees under the Act rests with the sound discretion of the trial court. *Roche v. Fireside Chrysler-Plymouth, Mazda, Inc.*, 235 Ill. App. 3d 70, 86, 600 N.E.2d 1218, 1228 (1992).

■ In the instant case, the trial court held that the Act was inapplicable: "[T]his is essentially a breach of contract case. This court concludes that the jury's verdict, coupled with its answers to the Special Interrogatories[,] supports that conclusion. Further, the jury's answer to Special Interrogatory [N]o. [2] mitigates against a finding of a violation of the Act." The trial court relied on *Bankier v. First Federal Savings & Loan Ass'n*, 225 Ill. App. 3d 864, 588 N.E.2d 391 (1992), and *Exchange National Bank v. Farm Bureau Life Insurance Co.*, 108 Ill. App. 3d 212, 438 N.E.2d 1247 (1982). However, those cases are distinguishable: neither case involved the sale of a home from a builder-vendor to a buyer for use as a primary residence. We also find the trial court's order possibly in error because it appeared to rely, at least in part, on the jury's answer to special interrogatory No. 2. That interrogatory asked the jury to determine whether the sellers "intentionally" concealed or misrepresented or omitted to tell the buyers that the house was constructed in substantial part in violation of applicable building codes. It is well settled that the Act does not authorize jury trials. *Rubin v. Marshall Field & Co.*, 232 Ill. App. 3d 522, 531, 597 N.E.2d 688, 693 (1992); *Richard/Allen/Winter, Ltd. v. Waldorf*, 156 Ill. App. 3d 717, 725, 509 N.E.2d 1078, 1081 (1987). While the trial court said that it had made its own assessment of all the evidence, it further stated that it "consider[ed] and accept[ed] the jury's answers to the Special Interrogatories." We are concerned that the trial court improperly delegated part of its fact-finding function to the jury and compromised its own independent determination. We also find that special interrogatory No. 2 did not correctly state the law.

■ In order to establish a deceptive-practice claim, a plaintiff must allege and prove (1) the misrepresentation or concealment of a material fact, (2) an intent that the buyer rely on the misrepresentation or concealment, and (3) that the deception occurred in the course of conduct involving trade or commerce. 815 ILCS 5/2d (West 1994); *Siegel v. Levy Organization Development Co.*, 153 Ill. 2d 534, 542, 607 N.E.2d 194, 198 (1992). Regarding the element of intent, innocent misrepresentations may be actionable. *Warren*, 142 Ill. App. 3d at 566, 491 N.E.2d at 474. The key consideration is the effect of the seller's conduct, not his intent. *Grimes v. Adlesperger*, 67 Ill. App. 3d 582, 585, 384 N.E.2d 537, 539 (1978). The court in *Honecker* held:

> "[T]he intention of the seller—his good or bad faith—is not important. Rather, we focus our attention upon the effect that that conduct might have on the consumer who was unjustifiably misled into purchasing that which he did not intend to purchase." *Honecker*, 46 Ill. App. 3d at 259, 361 N.E.2d at 1374-75.

The buyer need not show that the seller intended to deceive but must

show only that the seller intended the buyer to rely on the act or information; even an innocent or negligent misrepresentation may be actionable under the Act. *Griffin v. Universal Casualty Co.*, 274 Ill. App. 3d 1056, 1065, 654 N.E.2d 694, 700 (1995); *Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Development Co.*, 197 Ill. App. 3d 948, 557 N.E.2d 246 (1990).

■ Here, the builder-vendor may not have intended to deceive the buyers, but he certainly intended for home buyers to rely on his model homes as an indicator of the quality of homes he built and on his promise of R-19 insulation throughout most of the home. Thus, the second interrogatory was misleading and should not have been relied on by the trial court. The trial court's finding that the Act does not apply must be reversed, and the cause is remanded with directions for the court to make its own independent evaluation of whether the Act applies and whether attorney fees are appropriate.

## B. PIERCING THE CORPORATE VEIL

In their appeal, sellers contend that the trial court erred in refusing to dismiss counts IV and V of buyers' counterclaim and in entering judgment against Wolfe and Falcon Land Company because the piercing of the corporate veil of Falcon Associates, Inc., the contracting party, was not justified. Wolfe and Falcon Land Company specifically argue that their motion for directed verdict on counts IV and V should have been granted and that buyers' instruction No. 10 should not have been given. Buyers respond that justice required that Wolfe and Falcon Land Company be liable for the actions of Falcon Associates, Inc., because the transaction between Falcon Land Company and Falcon Associates, Inc., created a *de facto* merger or, in the alternative, Falcon Land Company was nothing more than the alter ego of Falcon Associates, Inc., and because Wolfe was the sole shareholder of the corporation. Furthermore, buyers point out that within the statement of the case, it was stated that all three counterdefendants were to be treated as a single party and no one objected to the trial court's statement of the case. We agree with buyers.

■ A court may find corporate officers personally liable for corporate obligations through a remedy known as piercing the corporate veil. *Ted Harrison Oil Co. v. Dokka*, 247 Ill. App. 3d 791, 617 N.E.2d 898 (1993). In order to pierce the corporate veil, there must be (1) such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) such circumstances that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences. *Dokka*, 247 Ill. App. 3d at 795, 617

N.E.2d at 901, citing *People ex rel. Scott v. Pintozzi*, 50 Ill. 2d 115, 128-29, 277 N.E.2d 844, 851-52 (1971). A corporate entity will be disregarded if it would otherwise present an obstacle to the protection of private rights or if the corporation is an alter ego or business conduit of the governing or dominant personality. *Import Sales, Inc. v. Continental Bearings Corp.*, 217 Ill. App. 3d 893, 904, 577 N.E.2d 1205, 1212 (1991). In determining whether to disregard a corporate entity, a court should consider a number of variables, with no single factor being determinative. Such variables include: (1) inadequate capitalization, (2) the failure to issue stock, (3) the failure to observe corporate formalities, (4) the payment of dividends, (5) the insolvency of the debtor corporation at the time, (6) the nonfunctioning of other corporate officers or directors, (7) the absence of corporate records, and (8) whether the corporation is a mere facade for the operation of dominant stockholders. *Dokka*, 247 Ill. App. 3d at 795, 617 N.E.2d at 902. A reviewing court will only reverse a finding of the trial court on the issue of piercing the corporate veil if it is against the manifest weight of the evidence. *Dokka*, 247 Ill. App. 3d at 796, 617 N.E.2d at 902.

■ Here, we cannot say that the trial court's determination to pierce the corporate veil and to refuse to dismiss counts IV and V is against the manifest weight of the evidence. At one time, Falcon Associates, Inc., consisted of at least four partners, but at the time in question, the corporation consisted only of Robert G. Wolfe. It appears that no stock was issued, nor were any dividends paid. Moreover, it appears that there was a *de facto* merger of Falcon Associates, Inc., and Falcon Land Company. Falcon Associates, Inc., transferred all of its assets to Falcon Land Company in 1994 and 1995 after the sale of the home at 1010 Thornbury to buyers and after the buyers started their campaign against sellers to fix their home. Sellers failed to object to the statement of the case, which stated that all three parties should be treated as a single party. Neither Falcon Land Company nor Wolfe objected to this statement, which was read to the jury. Therefore, all three counterdefendants acquiesced in the determination that they were but one single entity.

## C. DAMAGES ON THE BREACH OF CONTRACT CLAIM

Sellers next allege that the damages awarded on the buyers' breach of contract claim were excessive, improper, speculative, and erroneous. Sellers specifically object to the jury's award of $82,999.02 for "other" damages as unspecified, unproved, and improper. The sellers argue that the bulk of this unspecified lump sum of "other" damages is comprised of Mary Jean Love's request for $63,206 in lost wages, consequential damages that are limited by the contract. We agree.

The following verdict form was submitted to the jury:

"We assess the damages in the sum of $_____ itemized as follows:

For reasonable expenses of necessary repairs to the property which was damaged.                    $_____

For the value of loss of use of the building for the time reasonably required for the repair.                    $_____

For the difference between the fair market value of the real property immediately before the occurrence and its fair market value after the repairs.                    $_____."

During deliberations, the jury sent out the following note:

"We have reached a verdict; however, the verdict form is ambiguous because it asks for a total itemization of damages, then a breakdown for reasonable expenses of necessary repairs and value for loss of use of the building; however, there are several items of damage which do not fall within either category. Help!"

A discussion between the trial judge and attorneys for the parties then ensued. After advising counsel they would not be waiving future objections, the following response was sent to the jury without an objection by either party:

"The court will allow you to further itemize the damages determined on the appropriate verdict form. You may write in this further itemization."

The jury then sent back the verdict form previously set forth in the factual statement of this opinion.

■ A review of the record shows that the sellers failed to argue that the buyers' remedies were limited by the contract. Likewise, the sellers failed to object to the introduction of lost-wage evidence presented by the buyers either during the testimony of Mary Jean Love or during closing arguments.

The sellers did, however, sufficiently raise the contractual defense in their posttrial motion. See *Haight v. Aldridge Electric Co.*, 215 Ill. App. 3d 353, 575 N.E.2d 243 (1991). The contractual provision in question states, "Builder shall not be liable for any incidental or consequential damage that may arise as a result of this contract, the construction of the building, its ownership, [its] occupancy[,] or any matter related to this agreement." This language is sufficient to bar the recovery of the damages herein labeled "Other," and the damages award is modified accordingly. See *First National Bank & Trust Co. v. First National Bank*, 178 Ill. App. 3d 180, 533 N.E.2d 8 (1988).

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed in part as modified and reversed in part, and

666

the cause is remanded with directions.

Affirmed in part as modified and reversed in part; cause remanded with directions.

RARICK[1] and MAAG, JJ., concur.

_____

[1]Justice Kuehn participated in oral argument; Justice Rarick was later substituted on the panel.