Arthur ARENSON, individually and as Executor of the Estate of Sol Arenson, Deceased, and on behalf of a class, Plaintiff,

v.

WHITEHALL CONVALESCENT AND NURSING HOME, INC. and Paul Mulder, Defendants.

No. 94 C 2508.

United States District Court, N.D. Illinois Eastern Division.

March 24, 1995.

Aram A. Hartunian, Futterman & Howard, Chtd., Chicago, IL, for Arthur A. Arenson.

Algimantas P. Kezelis, Margaret R. Wolot, French, Kezelis & Kominiarek, P.C., Chicago, IL, for Whitehall Convalescent and Nursing Home, Inc., Paul Mulder.

Howard M. Hoffmann, Donald R. Lorenzen, Holleb & Coff, Chicago, IL, for Weber Automated Systems Co. Inc., Thomas Armand.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Arthur Arenson, individually and as Executor of the Estate of Sol Arenson, brought this putative class action against Whitehall Convalescent and Nursing Home, Inc. ("Whitehall"), and its president Paul Mulder ("Mulder") under the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and supplemental state law claims.[1] The defendants have filed a Motion to Dismiss the remaining counts of the plaintiff's complaint ("Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6),[2] and a Motion to Strike portions of the Complaint pursuant to Rule 12(f). For the reasons given below, defendants' Motion to Dismiss is granted as to Counts I and III, but denied as to Counts II, VIII, IX, and X.[3] The defendants' Motion to Strike is denied.[4]

## LEGAL STANDARDS

A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Triad Associates, Inc. v. Chicago Housing Auth.*, 892 F.2d 583, 586 (7th Cir. 1989), *cert. denied*, 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). All well-pleaded facts are taken as true, all inferences are drawn in favor of the plaintiff and all ambiguities are resolved in favor of the plaintiff. *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir.1992). Where, as here, fraud is alleged, Rule 9(b) of the Federal Rules of Civil Procedure requires the underlying facts of the lawsuit to be set out with particularity. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, —— U.S. ——, ——, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993). The federal

system of notice pleading does not favor dismissal for failure to state a claim. *Gray v. County of Dane*, 854 F.2d 179, 182 (7th Cir. 1988). In short, the only question is whether relief is possible under any set of facts that could be established consistent with the allegations. *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir.1992) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

## BACKGROUND

Plaintiff's well-pleaded allegations, which the Court treats as true and views in a light most favorable to the plaintiff for purposes of this Motion, are as follows. Whitehall operates a nursing home in Chicago, Illinois, that has had approximately seventy-five residents on a daily basis since 1989.[5] Mulder is the president of Whitehall. When a person becomes a resident at Whitehall, that person and/or his/her sponsor—a guarantor for the payment of all the charges, costs, and expenses incurred for or by the resident—signs an agreement ("Resident Agreement") with Whitehall. In the Resident Agreement Whitehall promises and agrees that the resident will be charged for prescription drugs and other pharmaceutical supplies ("Pharmaceuticals")[6] purchased by Whitehall at Whitehall's cost. Whitehall also distributes a "Schedule of Charges" to its residents and

---

**1.** The original complaint also named Weber Automated Systems Company, Inc. ("Weber"), and its president and owner Armand Thomas ("Thomas") as defendants. On June 28, 1994, the Court granted plaintiff's Motion for Voluntary Dismissal as to Weber and Thomas. The plaintiff has also expressed willingness—providing that the defendants do not claim that Arthur Arenson, individually, is a necessary party for their breach of contract claim (Count X)—to file an amended complaint that does not name Arthur Arenson, individually, as a party.

**2.** The Federal Rules of Civil Procedure will be referred to in this opinion as "Rule—."

**3.** The Court will not address the defendants' sole argument against Count X—that it is a supplemental state claim that does not belong in federal court absent a federal cause of action—because the Court finds that Count II properly alleges a federal cause of action under RICO.

**4.** The defendants' Motion to Strike the portion of plaintiff's Complaint requesting an injunction in conjunction with the RICO claims is moot be-

cause the plaintiff has agreed to seek an injunction solely in conjunction with his supplemental state law claims. The defendants' Motion to Strike the portion of plaintiff's Complaint requesting punitive damages is denied for the reasons below.

**5.** The Court shall avoid restating plaintiff's repeated allegation that the activities noted in the Complaint have taken place since at least 1989. Unless otherwise noted, the plaintiff has alleged that all the activities noted below have taken place since at least 1989.

**6.** In ¶ 9 of the Complaint, Plaintiff states that he will refer to prescription drugs and other pharmaceutical supplies as "pharmaceuticals." However, in the remainder of the Complaint Plaintiff only uses the word "pharmaceutical." The Court understands this word to mean prescription drugs and other pharmaceutical supplies (i.e., the meaning ascribed by plaintiff to "pharmaceuticals").

their sponsors which states that medications will be billed at the current charges by Weber. Weber is a pharmacy and a medical supply company, with an office located in Skokie, Illinois, that services nursing homes.

Whitehall entered into written agreements with Weber, pursuant to which Weber supplied all the Pharmaceuticals ordered by Whitehall for Whitehall's residents. Whitehall and Weber also entered into an oral agreement pursuant to which Weber generated two different sets of invoices for the Pharmaceuticals ordered by Whitehall. The first set of invoices showed the actual charges incurred by Whitehall for the Pharmaceuticals ordered from Weber. The second set of invoices purported to show the actual charges incurred by Whitehall for Pharmaceuticals ordered from Weber, but actually showed higher charges. Whitehall used the second set of invoices to collect higher amounts from the plaintiff and members of the putative class. According to the plaintiff, Whitehall's purpose in using the two sets of invoices was to cheat the plaintiff and members of the putative class by misrepresenting the charges that Whitehall incurred in purchasing Pharmaceuticals for them from Weber.

The defendants also allegedly knew, or could reasonably foresee, that the wires and mails would be used in the ordinary course of their business. Whitehall also regularly used the wires to order Pharmaceuticals from Weber. Whitehall regularly used the mails to: order Pharmaceuticals from Weber; receive Pharmaceuticals from Weber; receive the two sets of invoices from Weber; send payments to Weber; send the second set of invoices to plaintiff and members of the putative class; and receive payments from the putative class members based in part on the second set of invoices.

On July 6, 1992, Sol Arenson entered into the Resident Agreement with Whitehall. In the Resident Agreement Whitehall agreed that Sol Arenson would be charged for Phar-

maceuticals based on charges actually incurred by Whitehall. Whitehall also gave plaintiff a copy of the "Schedule of Charges," which provided that charges for medications would be billed at the current rate charged by Weber. Plaintiff paid Whitehall a deposit of $3,950.00 and signed the Resident Agreement as a sponsor. In July 1992, Whitehall purchased Pharmaceuticals for Sol Arenson. Shortly after Sol Arenson died on July 13, 1992, Whitehall mailed a billing statement to plaintiff that listed charges totaling $349.76 for Pharmaceuticals purchased by Whitehall for Sol Arenson and a two page invoice that purported to show a breakdown of these charges. This amount was deducted from the deposit that plaintiff paid to Whitehall. The actual amount that Weber charged Whitehall for these Pharmaceuticals, as shown by the invoice sent by Weber to Whitehall, was $284.89.

## COUNTS I and II

Count I alleges that Whitehall violated § 1962(c) of RICO through a pattern of mail and wire fraud.[7] Count II alleges that Mulder violated § 1962(c) through a pattern of mail and wire fraud.

### A. Rule 9(b)

The defendants first argue that the plaintiff has failed to allege the predicate acts of mail and wire fraud with the particularity required by Rule 9(b).[8] The defendants point out that the plaintiff's Complaint is devoid of specific allegations indicating when the alleged mail fraud took place, how many times the alleged mail fraud took place, the contents of the mailings, and who was responsible for the purported misrepresentations.

■■■■ A RICO complaint that rests on predicate acts of mail fraud meets the particularity requirement of Rule 9(b) if it, "within reason, describe[s] the time, place, and content of the mail . . . communications, and . . .

---

7. Citations to RICO will be made to Title 18 of the U.S.C., and not to RICO's internal numbering.

8. Because the court finds below that the plaintiff failed to properly plead wire fraud as a predicate

offense for their RICO claim, the court's discussion of the sufficiency of the complaint under Rule 9(b) will be limited to plaintiff's mail fraud allegations.

the parties to those communications." *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir.1994) (citing *Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344, 352–353 (7th Cir.1992)); *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir.1992); *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923–924 (7th Cir.1992); *U.S. Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1268 n. 6 (7th Cir.1990); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993); *R.E. Davis Chem. Corp. v. Nalco Chem. Co.*, 757 F.Supp. 1499, 1516 (N.D.Ill. 1990). However, Rule 9(b)'s requirement that fraud be alleged with particularity is relaxed where facts that the plaintiff would otherwise be required to plead are in the exclusive possession of the defendants. *Id.* (citing *Nelson v. Monroe Regional Medical Ctr.*, 925 F.2d 1555, 1567 n. 7 (7th Cir.), *cert. denied*, 502 U.S. 903, 112 S.Ct. 285, 116 L.Ed.2d 236 (1991)); *See also, Davis v. Coopers & Lybrand*, 787 F.Supp. 787, 793 (N.D.Ill.1992). Similarly, where a complaint involves allegations of corporate fraud, the particularity requirement may be relaxed where "it is difficult to attribute particular fraudulent conduct to each defendant as an individual." *Davis*, 787 F.Supp. at 793.

■ With respect to the alleged fraud, the plaintiff alleges that: Whitehall has had approximately seventy-five residents on a daily basis; whenever a person becomes a resident, a "Resident Agreement" is signed by that person and/or his/her sponsor; on July 6, 1992, Sol Arenson entered into a Resident Agreement with Whitehall; in the "Resident Agreement" Whitehall promised that Pharmaceuticals would be charged to the residents at the same rate that Whitehall was charged for them; Whitehall distributed a "Schedule of Charges" to its residents and their sponsors which stated that "medications" would be billed to the residents at the current rate Weber charged Whitehall; in July 1992, Whitehall gave Sol Arenson a copy of the "Schedule of Charges" then in effect; Weber, pursuant to an oral agreement with Whitehall, generated two sets of invoices, one which showed the actual amounts that Weber charged Whitehall for Pharmaceuticals and another invoice which, although purporting to show the actual

charges incurred by Whitehall, actually showed higher charges.

In addition, the plaintiff alleges that the purpose of producing the two sets of invoices was to cheat and deceive plaintiff and members of the putative class; that Whitehall used the mails to order Pharmaceuticals from Weber, receive the two sets of invoices from Weber, send payments to Weber, send the allegedly fraudulent invoices to plaintiff and members of the putative class, and receive payments from members of the putative class based in part on the allegedly fraudulent invoices; that shortly after Sol Arenson's death on July 13, 1992, Whitehall mailed a bill to the plaintiff that listed charges of $349.76 for Pharmaceuticals purchased for Sol Arenson; that Whitehall also mailed to plaintiff a two page invoice that purported to break-down the Pharmaceutical charges totaling $ 349.76; that the $ 349.76 charge was deducted from a deposit that the plaintiff had given Whitehall; and that the actual amount that Weber charged Whitehall for these Pharmaceuticals, as reflected in an invoice sent by Weber to Whitehall, was $284.89.

The foregoing allegations describe the elements of the alleged fraud with particularity, as required by Rule 9(b). For example, the plaintiff alleges that he received a billing statement from Whitehall shortly after Sol Arenson's death, and that this statement contained charges for Pharmaceuticals that were higher than the charges Whitehall actually incurred. Only where the facts involved are within the exclusive possession of Whitehall does the plaintiff fail to meet the particularity requirement of Rule 9(b). It is specifically for cases like this one that the requirement of Rule 9(b) is relaxed. Therefore, the allegations of fraud in the Complaint are stated with the requisite particularity.

### B. The Rico "Enterprise" and "Person" Requirement

■ The defendants next argue that plaintiff has failed to set forth the RICO "enterprise" and "person" as two separate entities. The defendants argue that, although plaintiff claims that Whitehall is both a RICO "enter-

prise" and "person" in the same Complaint, plaintiff fails to allege any "enterprise" in Count II. "[S]ection 1962(c) requires separate entities as the liable person and the enterprise which has its affairs conducted through a pattern of racketeering activity." *Haroco, Inc. v. Am. Nat'l Bank and Trust Co. of Chicago,* 747 F.2d 384, 400 (7th Cir. 1984), *aff'g on other grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). In Count I, Whitehall is the "person," and Weber is the "enterprise." In Count II, Mulder is the "person," and Weber and Whitehall are the "enterprises." Therefore, Counts I and II satisfy the requirement of a separate "person" and "enterprise" in a RICO complaint.

However, Count I fails for a related reason.[9] The United States Code prohibits "any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs...." 18 U.S.C. § 1962(c). Moreover, " 'to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprises's affairs,' one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young,* —— U.S. ——, ——, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993) (quoting 18 U.S.C. § 1962(c)). Plaintiff's allegations regarding this element of the RICO claim are little more than a restatement of the statutory language in § 1962(c), with "Mulder," "Weber," or "Whitehall" substituted in when the statute mentions "person" and "enterprise." In Count II, where Mulder is the "person," and Whitehall is one of the "enterprises," the absence of additional allegations regarding Mulder's conduct of or participation in Whitehall's affairs is not fatal to the RICO claim, because the Court can make a reasonable inference that Mulder, as Whitehall's president, participated in its operation or management.

However, no basis exists in Count I, where Whitehall is the "person," and Weber is the "enterprise," for making the inference that Whitehall participated in the operation or management of Weber.[10] A plain reading of the Complaint, and any reasonable inferences drawn from it, only reveal allegations that Weber supplied goods and services to Whitehall. Allegations of a simple supplier-purchaser relationship are insufficient to allege that Whitehall participated in the operation or management of Weber. *Cf. Haroco,* 747 F.2d at 402–403 ("[W]e think it virtually self-evident that a subsidiary acts on behalf of, and thus conducts the affairs of, its parent corporation.") (footnote omitted). Therefore, Count I, and the portion of Count II which alleges that Mulder participated in the conduct of Weber's affairs, is dismissed.

### C. Establishing A "Pattern of Racketeering Activity"

Next, the defendants argue that the plaintiff does not allege a pattern of racketeering activity as defined by § 1961(5) and the associated case law. The defendants argue that because the particular allegations in the Complaint only involve a single contract with the plaintiff, and do not set out the number of other alleged victims, or allege separate schemes, they fail to allege a pattern of racketeering activity.

A pattern of racketeering activity is established where "the racketeering predicates are related, and ... they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989).[11] In turn, the element of relatedness exists where " 'criminal acts ... have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated

---

**9.** Because the Court ultimately finds that Counts I and III should be dismissed, leaving Count II as the sole RICO Count, the defendants' argument that Whitehall cannot be a "person" in one count and an "enterprise" in another is moot.

**10.** Similarly, in Count II, there is not basis for making the inference that Mulder participated in Weber's affairs. However, because Whitehall is also named as the RICO enterprise in Count II, plaintiff properly states a RICO claim.

**11.** Because the Court finds that the allegations of wire fraud have been improperly plead, the only predicate acts that will be considered in determining whether a pattern of racketeering activity has been properly plead is the alleged mail fraud.

events.'" *Id.* at 240, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)). *See also Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 779 (7th Cir.1994) ("The relationship part of this 'continuity plus relationship' test requires that the predicate acts be 'committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct.'") (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986)).

█ The instant Complaint meets the relatedness prong of the "continuity plus relationship" test: the actions defendants are alleged to have undertaken involve the same purpose (i.e., to collect money from the residents and/or their sponsors which was not due under the Resident Agreement and the "Schedule of Charges"), the participants and victims are the same (i.e., Whitehall, Mulder, and Whitehall's other officers, agents, and employees, and the aggregate of Whitehall's approximately seventy-five daily residents since 1989), and the same methods of commission were employed (i.e., Whitehall promising and agreeing to charge for Pharmaceuticals, and representing that Pharmaceuticals would be charged, at the same rate that Whitehall was charged for them, and then mailing invoices that purported to show Whitehall's actual charges, but which actually showed higher charges). However, as is usually the case, the defendants' objections involve the "continuity" prong of the "continuity plus relationship" test. *See, e.g., Vicom*, 20 F.3d at 779 (most cases dealing with the RICO pattern requirement turn on the "continuity" prong).

█ "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J.*, 492 U.S. at 241, 109 S.Ct. at 2902. To determine whether closed-ended continuity has been established, the Court looks at the complaint through the prism of a number of factors outlined in *Morgan* which "'include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries.'" *Vicom*, 20 F.3d at 779–780 (quoting *Morgan*, 804 F.2d at 975). "Open-ended continuity is present when: (1) 'a specific threat of repetition' exists, (2) 'the predicates are a regular way of conducting [an] ongoing legitimate business,' or (3) 'the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.'" *Id.* at 782 (quoting *H.J.*, 492 U.S. at 242–243, 109 S.Ct. at 2902).

### 1. *Closed–Ended Approach*

█ Continuity has been established in this case under both the closed- and open-ended concepts. Analysis of the Complaint under most of the *Morgan* factors supports a finding that closed-ended continuity has been established. The cases cited in *Vicom* as examples of durations insufficient to establish closed-ended continuity involved predicate acts that took place over a period of time ranging from four months to two years. *Id.* at 780–781. The alleged predicate acts have been committed over a period of five years. This five year period is considerably longer than the time-frames listed in *Vicom.* Furthermore, each mailing of an allegedly fraudulent bill to a resident and/or their sponsor—as opposed to the ancillary mailings of Pharmaceuticals, invoices, and payments between Whitehall and Weber—indicated a continuation of the fraudulent activity. Plaintiff alleges that Whitehall has had seventy-five residents on a daily basis, and that Whitehall has been sending its residents and/or their sponsors fraudulent bills since 1989. Plaintiff therefore alleges a large number of separate predicate acts.

The number of Whitehall residents allegedly residing at the nursing home on a daily basis also supports a finding of "continuity" under the next *Morgan* factor—the number of victims. At the very least, if the Court makes the unlikely assumption that Whitehall's resident population has remained unchanged since 1989, the Complaint alleges that there have been seventy-five victims of the predicate acts of mail fraud. A reading of the Complaint that is more generous to the plaintiff's case, which is appropriate when dealing with a Motion to Dismiss, allows the

Court to infer that an even greater number of victims than alleged was involved, providing another reason for finding that continuity has been adequately established.

Analysis under the next *Morgan* factor—the occurrence of distinct injuries—also supports a finding that the plaintiff has established continuity. Even if all the injuries stemming from any one contract between Whitehall and its residents and/or their sponsors are counted as a single injury, there still would be a significant number of distinct injuries, equal to the number of residents that Whitehall has had since 1989.

Under the *Morgan* analysis, the only aspect of the Complaint that does not support finding that continuity has been established is its lack of separate schemes. However, on the whole, an analysis of the Complaint using all of the *Morgan* factors—especially in light of the alleged duration of the predicate acts, the alleged number of victims and injuries involved, and the post-*Morgan* "fall from grace" of the number of schemes as a bright-line for establishing continuity—supports a finding that continuity has been established. *See H.J.*, 492 U.S. at 240–241, 109 S.Ct. at 2901 (existence of separate schemes is not necessary to establish a pattern of racketeering activity); *see also Vicom*, 20 F.3d at 781 ("[T]he 'doctrinal requirement of a pattern of racketeering activity is a standard, not a rule'—'with no one factor being necessarily dispositive.'") (quoting *Morgan* 804 F.2d at 976).

### 2. *Open–Ended Approach*

■ The plaintiff has also established continuity under the open-ended approach, because the Complaint not only alleges that a specific threat of repetition exists, but also that the predicate acts are a regular way of conducting the defendants' business. The threat of repetition exists because there is no indication that the defendants will cease engaging in the predicate acts. Moreover, this scheme does not have a clear and terminable goal. *Cf. Vicom*, 20 F.3d at 782 ("[S]chemes which have a clear and terminable goal have a natural ending point ... [and] therefore cannot support a finding of any specific threat of continuity that would constitute open-ended continuity"). On the contrary,

the scheme alleged by the plaintiff ostensibly could last as long as Whitehall remains in operation. The plaintiff also alleges that the predicate acts of mail fraud are a regular way of conducting the defendants' business. The Complaint therefore can reasonably be read to allege that each bill that Whitehall regularly sent to its residents and/or their sponsors—or at least those that contained charges for Pharmaceuticals purchased from Weber—amounted to mail fraud. A finding of open-ended continuity can be supported in this case under two of the three scenarios under in open-ended continuity has been recognized. Because the Complaint can be read to allege that the predicate acts of mail fraud were related, and that they amount to, or, in the alternative, pose a threat of, continued criminal activity, plaintiff properly alleges a pattern of racketeering activity.

### D. *Mail Fraud*

■ The defendants next argue that the plaintiff improperly pled mail fraud, because he failed to allege that the defendants acted with the specific intent to defraud, and failed to allege detrimental reliance by the plaintiff or members of the putative class. The defendants cite *Chicago HMO v. Trans Pac. Life Ins. Co.*, 622 F.Supp. 489 (N.D.Ill.1985), for the proposition that allegations of wire or mail fraud must include allegations of specific intent. In *Chicago HMO*, the plaintiff, a health maintenance organization, sought to obtain insurance that would cover its losses during a specified period of time, regardless of when those losses would actually be paid. *Id.* at 491. The contract that the *Chicago HMO* plaintiff signed with the defendant insurance company defined losses covered by the policy as including money paid during the twelve months following a year long policy period. *Id.* However, the defendant insurance company refused to indemnify the plaintiff for payments made during those twelve months, arguing that it was only responsible for losses paid for during the policy period, and that inclusion of the provision in the policy which provided otherwise was a inadvertent clerical error.

On a motion to dismiss, the court in *Chicago HMO*, in response to the defendants argu-

ment that, "plaintiff has not specified the factual basis for the alleged conclusory allegation that the defendants acted with the requisite intent to defraud[,]" found that the fraud was pled adequately. *Id.* at 493–494. In this case, there are more allegations in the Complaint supporting an inference of the specific intent required for mail fraud than in *Chicago HMO.* For instance, the Complaint alleges that Whitehall entered into a written agreement with the plaintiff and members of the putative class to charge them for Pharmaceuticals at the same rate that Whitehall was charged for the Pharmaceuticals. Whitehall then entered into an oral agreement with Weber to produce two sets of invoices, one which purported to show the actual charges that Whitehall incurred, and another invoice which showed higher charges. Moreover, the Complaint alleges that both sets of invoices were sent by Weber to Whitehall. It is therefore difficult to read the Complaint as failing to allege that the defendants—with the two sets of invoices before them purporting to show charges for the same Pharmaceuticals, but actually showing different amounts—did not know that one of the statements was false. In addition, the plaintiff alleges that the predicate acts of mail fraud were undertaken by the defendants to further a scheme to obtain money from Whitehall residents and/or their sponsors. These allegations in the Complaint are sufficient to allege specific intent to defraud.

### E. Detrimental Reliance

The defendants' argument that the plaintiff failed to allege detrimental reliance also lacks merit. The Complaint alleges that Whitehall "used false invoices to collect higher amounts from Plaintiff and the Class Members," (Compl. ¶ 12), and that "Whitehall ... received payments from the Class Members ... for the charges asserted by Whitehall, including charges for pharmaceutical [sic] purchased from Weber." (Compl. ¶ 15(f)). These allegations are sufficient to allege detrimental reliance. Plaintiff and members of the putative class paid Whitehall,

to their financial detriment, more money than they would have paid if the bills they received from Whitehall showed the actual amounts charged for the Pharmaceuticals Whitehall purchased from Weber, rather than the inflated amounts they allegedly contained.

### F. Wire Fraud

Next, the defendants argue that the plaintiff improperly pled wire fraud because he failed to allege interstate use of wire communications.[12] Wire fraud is properly pled when it is alleged that a defendant "... having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... communication in *interstate* ... commerce, any writings ... for the purpose of executing such scheme or artifice...." 18 U.S.C. § 1343 (emphasis added).

The Complaint, and any reasonable inferences drawn from it, fails to allege that the wire communications between Whitehall and Weber were *interstate.* On the contrary, because the Complaint alleges that both Weber and Whitehall are located in Illinois, the only reasonable inference that can be drawn from the Complaint is that the alleged fraudulent communications were *intrastate.* The plaintiff's reliance on their allegation in the Complaint that the enterprise was engaged in and affected interstate commerce is misplaced and does not cure the lack of allegations regarding interstate use of the wires. RICO predicate acts must be indictable under one of the federal and state offenses listed in § 1961(1). *See McDonald v. Schencker,* 18 F.3d 491, 494 (7th Cir.1994). Wire fraud is an indictable offense under 18 U.S.C. § 1343, if it—unlike mail fraud which has no similar requirement—involves interstate communications. *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1276 (7th Cir.1989) (citing *United States v. Aldridge,* 484 F.2d

**12.** The defendants also argue that the plaintiff failed to allege detrimental reliance when pleading wire fraud. The Court does not have to reach this argument in light of the fact that the portion of plaintiff's Complaint setting out wire fraud as a predicate to the RICO claim shall be dismissed because the Complaint fails to allege interstate wire communications.

655, 660 (7th Cir.1973)). The requirement that the RICO enterprise affect interstate commerce is separate from the same requirement listed in § 1961(1). Therefore, allegations of wire communications that were solely intrastate in character, even if they are pled as predicate acts in conjunction with an enterprise alleged to affect interstate commerce, are insufficient to plead wire fraud. Consequently those portions of the Complaint that use wire fraud as a predicate offense for the RICO claim are dismissed.

### COUNT III

 Count III alleges a cause of action against Whitehall under a theory of *respondeat superior* for purported violations of § 1962(c) of RICO through a pattern of mail and wire fraud by Whitehall's agents and employees. The defendants argue that *respondeat superior* is inapplicable to RICO cases. Vicarious liability in civil RICO cases is appropriate "when 1) the corporation has derived some benefit from the RICO violation and 2) imposing vicarious liability is not inconsistent with the intent of Congress." *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1306 (7th Cir.1987), *cert. denied*, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989). Congressional intent with respect to § 1962(c) suggests that vicarious liability is not appropriate where a finding of such liability "would require the 'person' and 'enterprise' to be the same entity." *Id.* at 1306–1307.

 In Count III, plaintiff alleges that Weber is the "enterprise," that Mulder, and Whitehall's other officers, agents, and employees are the "person(s)," and that Whitehall is responsible under a theory of *respondeat superior* for the RICO violations of its officers, agents, and employees. In Count III, plaintiff fails to state a cause of action, because he does not properly plead the underlying RICO claim for the same reasons that the RICO claim in Count I was dismissed (i.e., there are no allegations that Whitehall's officers, agents, and employees participated in the operation or management of Weber). Substituting Whitehall for Weber as the enterprise in Count III would not revive the claim, because Whitehall then would be both the "person" and the "enterprise." This kind of allegation would therefore violate the second prong of the *Liquid Air* test, as it is applied to *respondeat superior* claims based on purported violations of § 1962(c).

### COUNTS VIII and IX

Count VIII alleges a cause of action against Whitehall and Mulder under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (Supp.1993). Count IX alleges a cause of action against Whitehall and Mulder for fraud under Illinois common law.

The defendants first argument against Counts VIII and IX—that plaintiff has failed to plead fraud with the particularity required by Federal Rule of Civil Procedure 9(b)—fails for the same reason here as it did when made against Counts I and II (i.e., the plaintiff has pled all the facts that were within his possession).

Next, the defendants argue that the plaintiff failed to plead all the elements of statutory and common law fraud. With regard to the statutory fraud claim, the defendants argue that the plaintiff failed to allege that: (a) the statements made by the defendants were made without regard as to the defendants' knowledge or lack of knowledge as to the untrue statements; (b) that the statements were made for the purpose of inducing reliance on the part of the plaintiff or members of the putative class; and (c) the plaintiff or members of the putative class relied on the untrue statements.

With regard to the common law fraud claim, the defendants argue that the plaintiff failed to allege that: (a) the defendants knew or believed that the statements made were untrue; (b) the plaintiff or any of the putative class members had a right to rely on the defendants' statements; and (c) that the statements were made by the defendants for the purpose of inducing the plaintiff or any of the putative class members to act.

 The objections defendants raise to plaintiff's pleading of common law and statutory fraud have been addressed and rejected as meritless by the Court in conjunction with

defendant's objections to plaintiff's pleading of mail fraud. The only claim that has not been previously addressed (i.e., that plaintiff failed to allege that the defendants' statements were made without regard as to the defendants' knowledge or lack of knowledge as to the falsity of these statements), imputes an element to the offense that does not exist under the Illinois Consumer Fraud and Deceptive Business Practices Act. The element that the defendants are referring to requires an allegation of a statement "that was untrue, without regard to the defendant's knowledge or lack thereof of such untruth."[13] *See Roche v. Fireside Chrysler–Plymouth, Mazda, Inc.*, 235 Ill.App.3d 70, 79, 175 Ill. Dec. 760, 769, 600 N.E.2d 1218, 1227 (2d Dist.1992). A statutory fraud claim only requires the plaintiff to establish that the statements made were untrue. Plaintiff has satisfied this pleading requirement. Therefore, the defendants' Motion to Dismiss the plaintiffs' causes of action in Counts VIII and IX under the Illinois Consumer Fraud and Deceptive Business Practices Act and under Illinois common law fraud is denied.

### G. Punitive Damages

Finally, the defendants argue that plaintiff's request for punitive damages under Counts VIII and IX should be stricken pursuant to Rule 12(f), because there is no evidence that the defendants acted willfully, with actual malice, or with the intention of cheating the plaintiff and the putative class members with such utter indifference as to indicate a wanton disregard for their rights. Nor is there any evidence that punitive damages are appropriate. Rule 12(f) authorizes the Court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The ground cited by the defendants for invoking Rule 12(f)—the lack of evidence in the Complaint to support a theory of recovery—does not fit into any category of material the Court is authorized to strike under 12(f).

Moreover, at this stage of the process the Court is looking at the Complaint to determine whether the plaintiff can recover, assuming his allegations are supported by the evidence, and is not looking to determine whether the evidence presented supports those allegations. Therefore, the defendants' Motion to Strike plaintiff's request for punitive damages under Counts VII and IX is denied.

### CONCLUSION

For the above-stated reasons, this Court hereby grants defendants' Motion to Dismiss Counts I and III. The Clerk of the Court is therefore directed to dismiss Counts I and III with prejudice. Defendants' Motion to Dismiss Counts II, VIII, IX and X is denied. Defendants' Motion to Strike also is denied.

After careful review of the relevant pleadings, this Court also hereby grants Plaintiffs' pending Motion to Compel. The Court finds that the limited privacy interests involved in the disputed invoices can be protected through the entry of an appropriate protective order. The Court therefore orders that the defendants turn over all documents in its possession which are responsive to plaintiff's Motion to Compel by April 28, 1994.

Plaintiff is hereby ordered to file a Motion for Class Certification, and supporting brief, by June 1, 1995.

---

**13.** The defendants appear to misinterpret this requirement twice: first, by reading the statutory language to deal with the defendant's knowledge of the untrue statements, as opposed to their knowledge as to the untruth of the statements; and, second, by ignoring the statute's explicit command that a defendant's knowledge as to the untruth of the statements is immaterial for the purposes of stating a claim.