**Augustine N. ESPOSITO,
et al., Plaintiffs,**

**v.**

**Barnard H. SOSKIN, Defendant.**

**No. 97 C 6680.**

United States District Court,
N.D. Illinois,
Eastern Division.

May 18, 1998.

---

William Franklin Marutzky, Howard K. Priess, II, James Kenneth Borcia, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, for Plaintiffs.

Robert Harrington Riley, James Patrick Gaughan, Jr., Matthew J. Fischer, Schiff, Hardin & White, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

The plaintiffs in this case are the minority shareholders of Southeast Ohio Hockey Corp. (Southeast), a Subchapter S corporation which operates a minor league hockey team in Ohio. They allege that the majority shareholder, defendant Barnard H. Soskin, duped them into investing in an undercapitalized corporation by hiding the fact that he did not pay for his shares, entrenched himself as president, refused to allow them to inspect Southeast's books, misrepresented Southeast's finances to the tax authorities, stole money from Southeast, and hindered the success of Southeast by keeping it undercapitalized. Their second amended complaint will survive Soskin's motion to dismiss only if (1) they are the proper parties to bring this suit; and (2) their allegations state a claim of a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO).

### I. Individual Capacity Claims

Soskin believes that the harms alleged by the plaintiffs were actually suffered in the first instance by Southeast—that is, that the plaintiffs have suffered only derivative harm—and that they therefore should not be allowed to bring this suit in their individual capacities. It is unclear, however, by what means he should make this objection. Rule 12(b)(6) (stating a RICO claim) and 17(a) ("real party in interest") both seem like possibilities. Rule 12(b)(1) is not, however, for even though we will use the term "standing" to describe the plaintiffs' ability to bring this suit in their individual capacities, it is clear that the plaintiffs have standing in the constitutional sense, as they have alleged injury in fact. *See Felzen v. Andreas,* 134 F.3d 873, 876 (7th Cir.1998); *Frank v. Hadesman & Frank, Inc.,* 83 F.3d 158, 159 (7th Cir.1996). We doubt that the choice of rule will matter much, however, and we take our cue from some of the Seventh Circuit decisions in this area and proceed with an examination of RICO itself. *See generally Rylewicz v. Beaton Servs., Ltd.,* 888 F.2d 1175, 1178–79 (7th Cir.1989) (affirming the dismissal of a RICO count).

Only a person who is "injured in his business or property by reason of a violation" of 18 U.S.C. § 1962 has standing to complain of a RICO violation 18 U.S.C. § 1964(c). It is by now well understood that this means that "[s]hareholders of a corporation do not have standing as individuals to bring a RICO

action for diminution in the value of their stock caused allegedly by racketeering activities conducted against the corporation." *Sears v. Likens*, 912 F.2d 889, 892 (7th Cir. 1990); *see also Rylewicz*, 888 F.2d at 1179. Several of the injuries alleged in the second amended complaint are injuries to Southeast, and the plaintiffs therefore do not have standing to raise them when suing in their individual capacities. These include Soskin's stealing from Southeast, hindering the success of Southeast by keeping it undercapitalized, entrenching himself as President, and misrepresenting Southeast's finances to the tax authorities.[1]

■ To this analysis the plaintiffs offer one objection: we should conduct it using the law of the state of incorporation (Ohio), and under Ohio law the plaintiffs, as minority shareholders of a close corporation complaining of breaches of fiduciary duty by the majority shareholder, may sue in their individual capacities. We agree with the second part, *see Bagdon v. Bridgeston/Firestone, Inc.*, 916 F.2d 379, 383–84 (7th Cir.1990) (discussing *Crosby v. Beam*, 47 Ohio St.3d 105, 548 N.E.2d 217 (1989)), but take issue with the first. While *Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90, 97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991), teaches that whether a federal law claim may be brought directly or derivatively is a question of federal law for which state law should usually control, *see* 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.1.02[3][a] & n.7 (3d ed.1997), it recognizes an exception when "express provisions in analogous statutory schemes embody congressional choices readily applicable to the matter at hand." Congress used a provi-

sion of the federal antitrust laws as its model for § 1964(c), and the Supreme Court relied on its decisions interpreting the former when interpreting the latter. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 267–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) ("We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used ... in the Clayton Act's § 4."); *see also Carter v. Berger*, 777 F.2d 1173, 1174 (7th Cir.1985). We see no reason to think that RICO's standing provision, modeled on one borrowed from another area of federal law, should be interpreted with state law in mind. *See* 2 ARTHUR F. MATHEWS ET AL., CIVIL RICO LITIGATION § 8.04[C][6] (1992) ("*Holmes* ... never suggests that its standing analysis is derived in any respect from ... state law ....").

■ Our conclusion that state law does not govern questions arising under § 1964(c) does not necessarily answer what we take as the plaintiffs' underlying contention: as minority shareholders of a closely-held corporation they suffered direct injury from the majority shareholder's alleged breaches of fiduciary duty.[2] *See generally* DEBORAH A. DEMOTT, SHAREHOLDER DERIVATIVE ACTIONS LAW AND PRACTICE § 2:01(2) (1994 & Supp. 1997). *Holmes* does not discuss any exception to the derivative rule for closely held corporations, however, and the Seventh Circuit has exhibited some hostility to the idea. *See Bagdon*, 916 F.2d at 383–84; *cf. Rylewicz*, 888 F.2d at 1179 (declining to reach the question); *Mid–State Fertilizer Co. v. Ex-*

---

1. The plaintiffs also allege that the tax misrepresentation led to an underreporting of Southeast's income and hence (because Southeast was organized under Subchapter S) their own income, *see* 26 U.S.C. § 1366(c), which means that they may someday be found liable for taxes they have not paid. This claim of a possible injury in the future does not, however, qualify as a cognizable injury. *See Midwest Commerce Banking v. Elkhart City Centre*, 4 F.3d 521, 526 (7th Cir.1993) ("You cannot seek an award of damages for a fraud ... before the fraud has harmed you....."). Also, the fact that the shareholders are taxed on Southeast's income as though it were their own does not imply that Southeast's income actually was passed automatically through to them. *See* 2d Am. Compl. Ex. A ¶ 14 (Subchapter S provi-

sion of Close Corporation Agreement). If it was, the plaintiffs might have been able to sue Soskin in their individual capacities for injuries, like theft from Southeast, which would otherwise be considered derivative injuries as to them. *Cf. Klapper v. Commonwealth Realty Trust*, 657 F.Supp. 948, 953–54 (D.Del.1987) (allowing an individual capacity suit by REIT shareholders due to a direct loss in income).

2. We are aware that the plaintiffs have also sued Soskin in Ohio state court for breach of fiduciary duty, *see* Def.'s Mot. to Dismiss Ex. A (state complaint), but as this fact does not appear in the second amended complaint, it plays no part in our analysis. *See* FED. R. CIV. P. 12(b).

*change Nat'l Bank of Chicago,* 877 F.2d 1333, 1340 (7th Cir.1989) (Ripple, J., concurring) (arguing for a narrow exception for closely held corporations which is not applicable here). We are unaware of any case in this circuit embracing it, and in the absence of any argument from plaintiffs on the subject, we decline to be the first.

▌ This leaves two alleged direct injuries, namely that Soskin duped the plaintiffs into investing in an undercapitalized corporation by hiding the fact that he did not pay for his shares and that he refused to allow them to inspect Southeast's books. But here it becomes necessary to distinguish between the plaintiffs. Plaintiff Anthony Esposito received his stock in mid-December, 1996, in exchange for his release of claims against Soskin stemming from an unrelated venture. All of acts of racketeering activity alleged in the complaint, however, were committed before then,[3] so it is not possible that Anthony Esposito was injured in his individual capacity "by reason of" any RICO violation by Soskin. *See Marshall & Ilsley Trust Co. v. Pate,* 819 F.2d 806, 809–810 (7th Cir.1987) (plaintiff must be injured by at least one instance of racketeering activity). We therefore dismiss his individual RICO claims.

▌ Plaintiffs Augustine Esposito, Lawrence Malone, and Steven Rossa all bought their stock in early 1991. As part of the sale, however, only Augustine Esposito alleges that he was the victim of what is known as a "predicate act", one of the racketeering activities specified in 18 U.S.C. § 1961(1), in this case, wire fraud. The most the remaining plaintiffs can complain of is common law fraud in connection with the sale, *see* Compl. ¶ 19, and common law fraud is not a predicate act, see 18 U.S.C. § 1961(1). Since Soskin's refusal to allow the plaintiffs to examine Southeast's books did not involve *any* predicate act, *see id.* ¶ 23, this means that neither Malone nor Rossa was ever directly injured by Soskin's commission of a predicate act. Again, this is fatal, *see Marshall,* 819 F.2d at 809–810, so we dismiss their individual RICO claims. Augustine Esposito alone was di-

rectly injured by Soskin's commission of a predicate act, and he alone is entitled to press RICO claims in his individual capacity. *See Ceribelli v. Elghanayan,* 990 F.2d 62, 64 (2d Cir.1993) (allowing a direct RICO action for mail fraud in connection with the sale of stock).

## II. Derivative Claims

▌ The second amended complaint also contains allegations intended to allow the plaintiffs to sue Soskin derivatively (i.e. as shareholders on behalf of Southeast) for the same RICO and common law fraud violations of which they complained in their individual capacities. Soskin has moved to dismiss these counts of the second amended complaint, arguing that they do not meet the requirements of Rule 23.1.

We have a more fundamental objection to these claims: they evince a fundamental misunderstanding of derivative suits. Rule 23.1 allows shareholders to enforce rights of the corporation which the corporation itself has declined to enforce. Accordingly, the rule requires that the shareholders either (1) ask the board of directors to enforce the right (generally known as making a demand on the board) and describe why the board declined to do so, or (2) explain why making that demand would be futile. *See* FED. R. CIV. P. 23.1; *see also Drage v. Procter & Gamble,* 119 Ohio App.3d 19, 119 Ohio St.3d 19, 694 N.E.2d 479, 480–81 (1997) (Ohio law); *Kamen,* 500 U.S. at 108, 111 S.Ct. 1711 (state law governs demand requirements). Implicit in this, of course, is that if the board votes to proceed with the suit, a shareholder derivative suit is prohibited. *See Drage,* 119 Ohio App.3d 19, 119 Ohio St.3d 19, 694 N.E.2d 479, 480; *see also* ROBERT CHARLES CLARK, CORPORATE LAW 640 (1986).

At least according to the allegations of the second amended complaint, Southeast's board of directors actually did approve this suit. The second amended complaint alleges that three of the plaintiffs are three of South-

---

**3.** Paragraph 31 of the Second Amended Complaint does allege that Soskin used the mails through January, 1997, in furtherance of the sale of one of Southeast's hockey franchises, a transaction in which he took more than his fair share

of the resulting profits. "Used the mails" is all it alleges, however, and Rule 9(b) requires more for a valid allegation of mail fraud. *See Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir.1992).

east's five directors and thus "constitute a majority of the Company's Board of Directors and have the authority to pursue this action on behalf of the corporation." 2d Am. Compl. ¶ 11; *see also* OHIO REV. CODE ANN. § 1701.62. It further alleges that the Close Corporation Agreement (attached as Exhibit A to the second amended complaint) "provided that all decisions of the Company's Board of Directors 'shall be made without the necessity of a meeting by a majority vote of the Directors.'" *Id.* ¶ 12 (quoting *id.* Ex. A ¶ 4); *see also* OHIO REV. CODE ANN. § 1701.61. Finally, it states that "Prior to filing this action, Plaintiffs GUS ESPOSITO, ROSSA, and MALONE, constituting a majority of the Company's Board of Directors, decided to institute this action." *Id.*

Some confusion seems to have resulted from the plaintiffs' failure to keep straight which hat they are wearing. When three of them, as directors, decided to authorize a suit by the company against Soskin, their action barred the shareholders—the director plaintiffs in their individual capacities and the one non-director plaintiff—from suing Soskin derivatively on Southeast's behalf. *See Felzen,* 134 F.3d at 875 ("Only when the corporation's board defaults in its duty to protect the interests of the investors is ... [a derivative suit] permitted."); *Young v. Colgate–Palmolive Co.,* 790 F.2d 567, 574 (7th Cir.1986) ("Plaintiff[s] ha[ve] insisted that [theirs] is a derivative action, and we have dealt with it as such."). A corporation is a necessary party to a derivative suit, *see Liddy v. Urbanek,* 707 F.2d 1222, 1224 (11th Cir.1983) (citing cases)—even though the plaintiffs did not name Southeast in this suit, *see* 2d Am. Compl. ¶¶ 5–6—and we take it as given that the corporation is a necessary party to a suit authorized by its board of directors. We therefore dismiss the derivative claims.

### III. RICO Allegations

■ The second amended complaint alleges violations of both 18 U.S.C. § 1962(b) and (c). The latter requires allegations of " '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 778 (7th Cir.1994) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). We discuss the third and fourth elements, below;

Soskin has not made an issue of the others. And while he has made an issue of § 1962(b), which prohibits "any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise," *see also Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1062 (2d Cir.1996), we think it beyond doubt that the allegations concerning Soskin's lying to the other shareholders about his payment for his shares (both at the beginning of the venture and later) and entrenching himself as president are sufficient to state a claim under that section. He also contends that the plaintiffs failed to allege an "acquisition injury" under § 1962(b), but as we are aware of no case in this district or circuit imposing such a requirement, we will not dismiss the plaintiffs' § 1962(b) claim on that ground.

#### 1. Racketeering Activity

■ Soskin argues that the plaintiffs' allegations of racketeering activities—mail and wire fraud—are not specific enough to satisfy Rule 9(b). We disagree. With the exception described in n. 3, *supra,* each allegation of mail and wire fraud describes when the communication was made (all were between January, 1991, and October, 1996), who made the misrepresentation (Soskin or his accountant), what was misrepresented (Soskin's payment of money for his shares, the state of Southeast's finances, or the circumstances surrounding Southeast's sale of one of its hockey franchises), and how the plaintiffs relied on the representation (by buying their shares, approving the sale of the franchise, and not taking other action against Soskin, the third of which we divine from a favorable reading of the complaint). *See* Compl. ¶¶ 19, 20, 29, 31. Rule 9(b) requires nothing more. *See Koulouris v. Estate of Chalmers,* 790 F.Supp. 1372, 1374–75 (N.D.Ill.1992).

#### 2. Pattern

■ We measure the sufficiency of plaintiffs' RICO pattern allegations with the "continuity plus relationship" test of *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), which predictably enough requires that the predicate acts be both related and

continuous. Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. 2893. Soskin does not address relatedness, and we think its presence here obvious.

Continuity may be established in one of two ways. The first is to allege an open-ended pattern, a pattern encompassing "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. 2893. It is difficult to imagine a reasonable threat of repetition here, however, for the predicate acts are mail and wire fraud, both of which require the sender to act with the specific intent to defraud, *see United States v. Vest*, 116 F.3d 1179, 1183 (7th Cir.1997), and it would be ludicrous for Soskin to try and defraud the plaintiffs again after having become aware of this suit. And since the second amended complaint states that the predicate acts simply allowed Soskin to dupe the plaintiffs into investing and to occasionally steal from the company, we have no reason to believe that "the predicate acts are a regular way of conducting [the] defendant's ongoing business," H.J., 492 U.S. at 243, 109 S.Ct. 2893. Further, bald allegations such as that Soskin's conduct "continue[s] to the present," Compl. ¶¶ 40, 59, are insufficient. *See Vicom*, 20 F.3d at 783.

■ The other method of satisfying the continuity requirement is to allege a closed-ended pattern, one which does not continue to the present but which "extend[ed] over a substantial period of time." *H.J.*, 492 U.S. at 242, 109 S.Ct. 2893. Under the Seventh Circuit's four-factor test for a closed-ended pattern, we examine: (1) " 'the number and variety of predicate acts and the length of time over which they were committed,' " (2) " 'the number of victims,' " (3) " 'the presence of separate schemes,' " and (4) " 'the occurrence of distinct injuries.' " *Vicom*, 20 F.3d at 780 (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986)). The length of time over which the predicate acts were committed is of primary importance, *see id.* ("duration 'is perhaps the closest thing we have to a brightline continuity test' ") (quoting *Spitz*, 976 F.2d at 1024), and there the plaintiffs' allegations fare well: the

predicate acts span nearly six years, well outside the danger zone of one year or less. *See id.* at 781 & n. 9; *Arenson v. Whitehall Convalescent & Nursing Home*, 880 F.Supp. 1202, 1211 (N.D.Ill.1995) ("This five year period is considerably longer than the timeframes listed in *Vicom*.").

■ None of the rest of the factors cut strongly against the finding of a closed-ended pattern. We count nine instances of mail and wire fraud (and we do not quadruple count where each of the four plaintiffs received a mailing, so as to avoid the problem described by Judge Cudahy in *Lipin Enters., Inc. v. Lee*, 803 F.2d 322, 325 (7th Cir.1986) (Cudahy, J., concurring), of confusing multiplicity with continuity) furthering two schemes: Soskin's plan fraudulently to obtain and maintain control over the corporation, and his plan to use that control to steal the corporation's money. There were five victims (the plaintiffs and Southeast)—or maybe six, if the federal government is counted because of the tax revenue it lost—and each suffered the injuries which we have already described. Looking at these allegations in a "natural and commonsense" way, *H.J.*, 492 U.S. at 237, 109 S.Ct. 2893, we believe that they describe a pattern of fraudulent conduct. Accordingly, Augustine Esposito may proceed with his RICO claims, and we will retain jurisdiction over all of the common law fraud claims.

## IV. Motion to Strike

Soskin has moved to strike the reference to him as an "alleged criminal" in the plaintiffs' response to his motion to dismiss. But his contention that "Plaintiffs' complaint does not allege that Soskin is a criminal," Def.'s Mot. to Strike at ¶ 2, is belied by his earlier recognition that the alleged acts of mail and wire fraud are "indictable offenses." Def.'s Mot. to Dismiss at 9. The second amended complaint alleges that Soskin committed mail and wire fraud, which means that it alleges that Soskin is guilty of a crime, which means that he is an "alleged criminal." We see no point in striking this obvious truism from the plaintiffs' brief.

## V. Conclusion

For the foregoing reasons, Soskin's motion to dismiss is granted in part and denied in part, and his motion to strike is denied. It is so ordered.